**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 1122; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 1236; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 2110; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES - LOCAL 3172; SERVICE EMPLOYEES INTERNATIONAL UNION - LOCAL 1000; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON | No. 25-3293<br><br>D.C. No.<br>3:25-cv-03698-SI<br><br><br>ORDER |

DEFENSE CIVIC ENGAGEMENT;
MAIN STREET ALLIANCE;
NATURAL RESOURCES
DEFENSE COUNCIL, INC.;
NORTHEAST ORGANIC
FARMING ASSOCIATION, INC.;
VOTEVETS ACTION FUND, INC.;
WESTERN WATERSHEDS
PROJECT; COUNTY OF SANTA
CLARA; CITY OF CHICAGO;
COUNTY OF MARTIN LUTHER
KING, JR.,; COUNTY OF HARRIS;
CITY OF BALTIMORE; CITY AND
COUNTY OF SAN FRANCISCO,

*Plaintiffs - Appellees*,

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official
capacity as Director of U.S. Office of
Management and Budget; UNITED
STATES OFFICE OF PERSONNEL
MANAGEMENT; CHARLES
EZELL, in his official capacity as
Acting Director of the U.S. Office of
Personnel Management; UNITED
STATES DEPARTMENT OF
GOVERNMENT EFFICIENCY;

ELON MUSK, in his official capacity as the actual head of the Department of Government Efficiency; AMY GLEASON, in her official capacity as the titular Acting Administrator of the Department of Government Efficiency; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture; UNITED STATES DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of the U.S. Department of Commerce; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of the U.S. Department of Defense; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her

official capacity as Secretary of the
U.S. Department of Homeland
Security; UNITED STATES
DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT;
SCOTT TURNER, in his official
capacity as Secretary of the U.S.
Department of Housing and Urban
Development; DOJ - UNITED
STATES DEPARTMENT OF
JUSTICE; PAMELA BONDI,
Attorney General, in her official
capacity as Attorney General of the
U.S. Department of Justice; UNITED
STATES DEPARTMENT OF THE
INTERIOR; DOUG BURGUM, in
his official capacity as Secretary of
the U.S. Department of the Interior;
UNITED STATES DEPARTMENT
OF LABOR; LORI CHAVEZ-
DEREMER, in her official capacity
as Secretary of the U.S. Department
of Labor; UNITED STATES
DEPARTMENT OF STATE;
MARCO RUBIO, in his official
capacity as Secretary of the U.S.
Department of State; UNITED
STATES DEPARTMENT OF THE
TREASURY; SCOTT BESSENT, in
his official capacity as Secretary of
U.S. Department of Treasury;
UNITED STATES DEPARTMENT
OF TRANSPORTATION; SEAN

DUFFY, in his official capacity as
Secretary for the U.S. Department of
Transportation; UNITED STATES
DEPARTMENT OF VETERANS
AFFAIRS; DOUG COLLINS, in his
official capacity as Secretary of
Veterans Affairs; AMERICORPS,
(a.k.a the Corporation for National
and Community Service); JENNIFER
BASTRESS TAHMASEBI, in her
official capacity as Interim Agency
Head of AmeriCorps; UNITED
STATES ENVIRONMENTAL
PROTECTION AGENCY; LEE
ZELDIN, in his official capacity as
Administrator of U.S. Environmental
Protection Agency; UNITED
STATES GENERAL SERVICES
ADMINISTRATION; STEPHEN
EHIKIAN, in his official capacity as
Acting Administrator for U.S.
General Services Administration;
NATIONAL LABOR RELATIONS
BOARD; MARVIN E. KAPLAN, in
his official capacity as Chairman of
the National Labor Relations Board;
WILLIAM COWEN, in his official
capacity as the Acting General
Counsel of the National Labor
Relations Board; NATIONAL
SCIENCE FOUNDATION; BRIAN
STONE, in his official capacity as
Acting Director of the National

Science Foundation; UNITED
STATES SMALL BUSINESS
ADMINISTRATION; KELLY
LOEFFLER, in her official capacity
as Administrator of the U.S. Small
Business Administration; SOCIAL
SECURITY ADMINISTRATION;
FRANK BISIGNANO,
Commissioner of Social Security,

*Defendants - Appellants*.

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Before:  William A. Fletcher, Consuelo M. Callahan, and
Lucy H. Koh, Circuit Judges

Filed May 30, 2025

Order by Judge W. Fletcher;
Dissent by Judge Callahan

# SUMMARY[*]

## Stay Pending Appeal / Executive Order

The panel denied an emergency motion by President Trump and various federal agencies (collectively, "Defendants") for a stay pending appeal of the district court's preliminary injunction in favor of Plaintiffs in their suit challenging Executive Order 14210, which directed federal agencies to undertake preparations to initiate large-scale reductions in force; a Memorandum issued by the directors of the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM") with instructions regarding the implementation of the Executive Order; and implementing Agency Reduction in Force and Reorganization Plans ("ARRPs").

Plaintiffs—a collection of unions, non-profit organizations, and local governments—alleged that Executive Order 14210, the OMB/OPM Memorandum, and the implementing ARRPs violated the constitutional separation of powers and the Administrative Procedure Act ("APA"). The district court issued an order granting a temporary restraining order against Defendants and compelling discovery of the ARRPs and documents related to their implementation. The district court subsequently granted Plaintiffs' request for a preliminary injunction providing essentially the same relief.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that all of the factors governing stay requests weighed in favor of Plaintiffs.

First, Defendants have not shown that they are likely to suffer irreparable injury from having to retain and pay federal employees who would otherwise have been terminated pursuant to the Executive Order and its implementation.

Second, Defendants have not made a strong showing that they are likely to succeed on the merits. The panel rejected Defendants' argument that Plaintiffs' claims must be channeled through the administrative system established by the Civil Service Reform Act ("CSRA"), thereby stripping the district court of subject matter jurisdiction. Plaintiffs' *ultra vires* and APA claims fall outside the scope of the CSRA's review provisions. Moreover, channeling Plaintiffs' claims would preclude meaningful judicial review. Accordingly, the panel held that Plaintiffs' claims were properly raised in the district court.

The panel held that Defendants failed to show a likelihood of success on the merits with respect to Plaintiffs' claims alleging that the actions of the President and Executive Order 14210 were *ultra vires* and therefore violated the separation of powers. Neither the Constitution nor any federal statute grants the President the authority to direct the kind of large-scale reorganization of the federal government at issue. With respect to the actions taken by the OMB, the OPM, and the Department of Government Efficiency ("DOGE"), the panel agreed with the district court that these organizations' actions directing other federal agencies to engage in restructuring and large-scale reductions in force were *ultra vires*. Accordingly,

Defendants failed to show a likelihood of success on the merits with respect to Plaintiffs' *ultra vires* claims.

The panel next held that Defendants failed to show a likelihood of success on the merits with respect to Plaintiffs' claims that the actions of the President, OMB, OPM, and DOGE violated the APA. The panel rejected Defendants' argument that the OMB/OPM Memorandum is not a final agency action and is therefore unreviewable by the district court. Nothing in the record indicates that OMB/OPM's actions are of a merely tentative or interlocutory nature. With respect to the merits of Plaintiffs' APA claims, which Defendants did not contest, the panel held that OMB/OPM's actions violated the APA for the reasons outlined in the panel's analysis of Plaintiffs' *ultra vires* claims. Accordingly, Defendants failed to show a likelihood of success on the merits with respect to Plaintiffs' APA claims.

Finally, the panel agreed with the district court that Plaintiffs would suffer irreparable injury in the absence of an injunction.

Dissenting, Judge Callahan would grant Defendants' motion to stay the district court's preliminary injunction pending appeal. In her view, Plaintiffs' claims are not justiciable. They effectively challenge the prospective termination of federal employees in the aggregate, and therefore are precluded by the CSRA. Even if Plaintiffs' claims are justiciable, Defendants are likely to prevail. The President has the right to direct agencies, and OMB and OPM to guide them, to exercise their statutory authority to lawfully conduct reductions in force. The district court failed to analyze and to make findings whether the reductions in force likely have resulted or will result in statutory violations, and therefore applied the wrong legal standard.

## COUNSEL

Alice X. Wang, Barbara J. Chisholm, Corinne Johnson, Robin S. Tholin, Stacey M. Leyton, Danielle E. Leonard, Altshuler Berzon LLP, San Francisco, California; Julia Torti, Protect Democracy, Washington, D.C.; Rushab Sanghvi, American Federation of Government Employees, Washington, D.C.; Skye Perryman, Tsuki Hoshijima, and Elena Goldstein, Democracy Forward Foundation, Washington, D.C.; for Plaintiffs-Appellees.

Maxwell A. Baldi, Courtney L. Dixon, and Mark R. Freeman, Attorneys, Appellate Staff, Civil Division; Andrew M. Bernie, Trial Attorney; Patrick D. Robbins, Acting United States Attorney; Eric D. McArthur, Deputy Assistant Attorney General; Yaakov M. Roth, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

## ORDER

W. FLETCHER, Circuit Judge:

On February 13, 2025, President Trump issued Executive Order 14210 ("Executive Order" or "Order") announcing "a critical transformation of the Federal bureaucracy." The Order instructed federal agencies to "promptly undertake preparations to initiate large-scale reductions in force" ("RIFs") in a number of areas, including "all agency initiatives, components, or operations that [the Trump] Administration suspend[ed] or close[d]." About two weeks later, the directors of the Office of Management and Budget ("OMB") and the Office of Personnel

Management ("OPM") issued a memorandum ("Memorandum") with instructions regarding the implementation of the Order. The Memorandum directed each agency head to submit for approval an Agency RIF and Reorganization Plan ("ARRP") that would "seek to achieve," among other things, "[a] significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that [we]re not required." The Memorandum laid out two "phases" of ARRP submissions, to be finalized for review and approval by April 14, 2025.

These actions have led to an unprecedented attempted restructuring of the federal government and its operations. We cannot fully capture the breadth of the changes without unduly lengthening this order, but we highlight a few examples. At the Department of Energy, the Department of Government Efficiency ("DOGE") has proposed cuts of up to 50% to the agency's workforce, including cuts of 54% to science and innovation programs and 61% to energy infrastructure and deployment. Dist. Ct. Dkt. No. 37-8, Ex. A. AmeriCorps has given notices and placed on leave 85% of its staff. Dist. Ct. Dkt. No. 37-12. The General Services Administration has announced plans to terminate nearly half its staff. It has already made significant cuts, leaving no employees to maintain fire protection systems, manage indoor air quality, or supervise asbestos inspections in government buildings. Dist. Ct. Dkt. No. 37-14. The Department of Health and Human Services has cut 93% of its National Institute for Occupational Safety and Health staff. Dist. Ct. Dkt. No. 37-27. DOGE posted 47 Social Security Administration field offices for sale, with further consolidation contemplated for regional offices. Dist. Ct. Dkt. No. 37-11. The Veteran's Administration has indicated an "initial objective" of cutting 80,000 employees, a goal

that the Administration's Secretary Doug Collins stated was prescribed by President Trump and OPM.  Dist. Ct. Dkt. No. 37-9, Ex. A.

In the wake of these changes and proposed changes, Plaintiffs—a collection of unions, non-profit organizations, and local governments—filed suit against President Trump and various federal agencies (collectively, "Defendants"), alleging that the Executive Order, the Memorandum, and the implementing ARRPs violated the constitutional separation of powers and the Administrative Procedure Act ("APA").  On May 9, the district court issued an order granting a temporary restraining order ("TRO") against Defendants and compelling discovery of the ARRPs and documents related to their implementation.[1]  *AFGE v. Trump*, No. 25-CV-03698, 2025 WL 1358477 (N.D. Cal. May 9, 2025).  The district court subsequently granted Plaintiffs' request for a preliminary injunction providing essentially the same relief.  *AFGE v. Trump*, No. 25-CV-03698, 2025 WL 1482511 (N.D. Cal. May 22, 2025).  Defendants filed in our court a request for an emergency stay of the district court's preliminary injunction.

Acting as the motions panel of our court, we deny Defendants' emergency motion for a stay of the district court's preliminary injunction.

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009).  The factors governing stay requests are much like those that govern

---

[1] The parties have voluntarily dismissed Defendants' emergency motion for a stay of the district court's TRO. No. 25-3030, Dkt. No. 45. Defendants have withdrawn a mandamus petition seeking to stay the district court's discovery order. No. 25-3034, Dkt. No. 39.

requests for preliminary injunctions: whether irreparable injury will result, whether the applicant has a strong likelihood of success on the merits, and whether the balance of interests favor a stay. *Id.* at 434. We conclude that all of the factors weigh in favor of Plaintiffs. We therefore deny the requested stay.

## I. Irreparable Injury

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). We begin our analysis by asking whether Defendants have shown that they are likely to suffer irreparable injury, because absent "a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011). We conclude that Defendants have not made such a showing.

Whether an applicant seeking a stay will suffer irreparable injury is an "individualized" inquiry. *Id.* at 969; *see Hilton v. Braunskill*, 481 U.S. 770, 777 (1987) (noting that "the traditional stay factors contemplate individualized judgments in each case"). Defendants cannot carry this burden "by submitting conclusory factual assertions and speculative arguments that are unsupported in the record." *Doe #1 v. Trump*, 957 F.3d 1050, 1059–60 (9th Cir. 2020). It has now been over a month since Plaintiffs first filed their complaint. Defendants have yet to show the district court— or us—a single piece of evidence in support of its allegation of irreparable injury resulting from the district court's TRO or preliminary injunction. We therefore cannot understand their claims of irreparable injury as anything other than "conclusory" and "speculative."

In *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017), we held that the government had failed to make the requisite showing of irreparable injury where it relied on an ICE official's sworn declaration describing the administrative burdens of the preliminary injunction on ICE's functions. We concluded that "[t]he conclusory assertions in this declaration . . . are neither persuasive nor supported by any actual evidence." *Id.* Here, Defendants' claims of irreparable injury do not even come in the form of a sworn declaration. Nor are they persuasive, alleging only that the government will suffer injury from having to retain and pay federal employees who would have otherwise been terminated pursuant to the Executive Order and its implementation.

We agree with the district court that the government does not "suffer by a temporary preservation of the status quo." *AFGE v. Trump*, 2025 WL 1358477, at *22. "Mere injuries, however substantial, in terms of money, time and energy necessarily expanded . . . are not enough" to show irreparable injury. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). This is especially true where, as here, the money that is being spent as a result of the preliminary injunction has already been appropriated by Congress. We do not find that federal agencies suffer significant, let alone irreparable, injury when they simply follow what has already been prescribed by the legislature.

## II. Likelihood of Success on the Merits

Not only have Defendants failed to make a threshold showing of irreparable injury sufficient to deny their request for an emergency stay pending appeal, they have also not

"made a strong showing that [they] [are] likely to succeed on the merits." *Hilton*, 481 U.S. at 776.

The district court below found that Plaintiffs' claims were justiciable in the federal courts. It then found that Plaintiffs were likely to succeed on the merits of their *ultra vires* claims, as well as some of their APA claims. We consider each of these issues in turn.

### A. Administrative Channeling

The Civil Service Reform Act of 1978 ("CSRA") "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Defendants argue that Plaintiffs' claims must be channeled through the administrative system established by the CSRA, thereby stripping the district court of subject matter jurisdiction.

To determine if Plaintiffs' claims "are of the type Congress intended to be reviewed within this statutory structure," we consider (1) whether the claims are "wholly collateral to a statute's review provisions," (2) whether the issues are "outside the agency's expertise," and (3) whether "a finding of preclusion could foreclose all meaningful judicial review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994) (cleaned up). "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.' But the same conclusion might follow if the factors point in different directions." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)). All three factors favor the Plaintiffs.

1

Plaintiffs' *ultra vires* and APA claims plainly fall outside the scope of the CSRA's review provisions. Two administrative bodies established by the CSRA are at issue. First, the Merit Systems Protection Board ("MSPB") reviews claims by federal employees arising out of specific adverse actions taken against them by their employer. 5 U.S.C. §§ 7512 (defining "[a]ctions covered"), 7513(d) (providing for procedures to appeal such actions to the MSPB); *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 13 (2012) (noting that the CSRA is applicable when "a covered employee challenges a covered action"). Second, the Federal Labor Relations Authority ("FLRA") reviews "issues relating to the duty to bargain in good faith" and unfair labor practices. 5 U.S.C. §§ 7105(a)(2), 7117, 7118. Neither body has the authority to address the type of constitutional and statutory claims raised by Plaintiffs.

Defendants do not dispute this lack of supporting authority when individual actions are at issue. Instead, they claim that Plaintiffs' suit is an "agglomerat[ion] [of] many individual employment actions," which, in their view, must be heard by either the MSPB or FLRA. We are not persuaded. Whether or not the federal agencies' "transformation[s]" and "large-scale reductions in force" can be characterized as an "agglomeration" of "individual employment actions," Plaintiffs are not challenging those employment decisions with respect to individual employees. Rather, they are challenging Defendants' constitutional and statutory authority to direct the federal agencies to take such actions in the first place.

Even assuming that the MSPB or FLRA could adjudicate, for example, an *ultra vires* claim within an

individual employment dispute, such a "constitutional challenge would be 'collateral' to the subject of that proceeding." *Axon*, 598 U.S. at 188. It is telling that in nearly every case cited by Defendants in which a court channeled a constitutional or statutory claim through the CSRA, the plaintiffs raised at least one claim properly within the unquestioned jurisdiction of the MSPB or FLRA. *See Elgin*, 567 U.S. 1 (challenging terminations based on failure to comply with Military Selective Service Act); *AFGE v. Sec'y of Air Force*, 716 F.3d 633 (D.C. Cir. 2013) (challenging Air Force's military uniform policy); *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) (challenging executive orders that set specific regulations on agency conduct in collective bargaining); *Alder v. Tennessee Valley Auth.*, 43 F. App'x 952 (6th Cir. 2002) (challenging terminations and breach of contract of a bargaining agreement). That is not true in the case now before us. Plaintiffs' claims are, in other words, "*wholly* collateral to [the CSRA]'s review provisions." *Thunder Basin*, 510 U.S. at 212 (emphasis added) (internal quotation omitted).

The dissent notes that several courts have concluded that challenges to the termination of federal employees are properly channeled through the CSRA. Dissent at 37. However, multiple courts have rejected the government's channeling argument in other cases. *State of New York v. McMahon*, No. 25-cv-10677 (D. Mass. May 22, 2025) (ECF 45); *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at \*11 (D.D.C. Apr. 22, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, No. C 25-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025). These cases are very similar to the case before us. The cases cited by the dissent are different in material ways. Two of the cases cited by the dissent involved at least one claim that was

properly within the jurisdiction of the MSPB or FLRA, as is true for many of the cases we cite in the preceding paragraph. *See Maryland v. U.S. Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at \*1 (4th Cir. Apr. 9, 2025) (challenging the termination of employees without the procedures required under 5 U.S.C. § 3502; 5 C.F.R. § 351.803(b)); *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420, 2025 WL 561080, at \*3 (D.D.C. Feb. 20, 2025) (considering claims of a violation of "the statute and regulations governing RIFs, including statutorily mandated notice requirements," *i.e.*, 5 U.S.C. § 3502; 5 C.F.R. § 351.501(a)).  The other two other cases are factually distinct. *Am. Foreign Serv. Ass'n v. Trump*, No. 25-CV-352, 2025 WL 573762, at \*7 (D.D.C. Feb. 21, 2025) (concluding that plaintiff's claims were "archetypal complaints about changed employment conditions and their follow-on effects"); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276, 2025 WL 470459, at \*2 (D. Mass. Feb. 12, 2025) (bringing solely APA claims related to OPM's "Fork in the Road" directive and highlighting no constitutional separation of powers issues).

2

Further, we agree with the district court's conclusion that the MSPB and FLRA lack the relevant expertise, as well as the jurisdiction, to decide them.  "[A]gency adjudications are generally ill suited to address structural constitutional challenges." *Carr v. Saul*, 593 U.S. 83, 92 (2021).  The same is true for Plaintiffs' statutory APA challenges.  *See Free Enter. Fund*, 561 U.S. at 491.  And as in *Axon*, "the Government here does not pretend that [Plaintiffs'] constitutional [and statutory] claims are . . . intertwined with or embedded in matters on which the [MSPB or FLRA] are expert."  598 U.S. at 195.

3

Finally, channeling Plaintiffs' claims would preclude meaningful judicial review.  As just discussed, the MSPB and FLRA lack the authority to address Plaintiffs' *ultra vires* and APA claims.  Thus, although some federal employees might be able to challenge their terminations in individual proceedings before the MSPB, that "would not 'obviate the need' to address their constitutional [and statutory] claims—which, again, allege injury not from this or that [employment action] but from subjection to [unlawful executive] authority."  *Id.*

Defendants suggest that Plaintiffs should file administrative grievances over individual employment disputes, await final decisions from the MSPB or FLRA, and then raise their statutory and constitutional claims for the first time in an appeal to the Court of Appeals for the Federal Circuit.  We would first note that the APA's presumption of judicial review is not overcome merely because Defendants can point to a theoretical alternative path for an aggrieved party to seek review.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 601 (2016) ("Nor is it an adequate alternative to APA review for a landowner to apply for a permit and then seek judicial review in the event of an unfavorable decision.").  Moreover, we agree with the district court that such a path to the federal courts would be meaningless where, as here, entire offices and functions are being eliminated from federal agencies.  Even successful Plaintiffs "would return to an empty agency with no infrastructure to support a resumption of their work." *AFGE*, 2025 WL 1482511, at *14 (internal quotation omitted).

Finally, Defendants offer no option at all for the non-union Plaintiffs in this case, who are not covered by the CSRA and are thereby unable to present any claim to the MSPB or FLRA in the first place. Defendants contend that such preclusion of judicial review was intended by the CSRA, arguing that "[w]hen a comprehensive remedial scheme permits review at the behest of some types of plaintiffs but not others, the proper inference is that the excluded parties cannot bring claims at all." But the CSRA does not allow for review of Plaintiffs' constitutional and statutory claims at all, regardless of what party raises them. We find it unlikely that Congress intended for the CSRA to preclude review for parties not even covered by that statute who allege claims outside the MSPB's and FLRA's jurisdiction.

In short, the district court below correctly determined that Plaintiffs' claims were properly raised in that court.

## B. *Ultra Vires*

In reviewing a district court's grant of a preliminary injunction, the burden of proof is on the party requesting a stay to show a likelihood of success on the merits. *Nat'l Wildlife Fd'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005). Defendants fail to show that they are likely to win on the underlying merits of Plaintiffs' claims. The first set of Plaintiffs' claims alleges that the actions of the President, OMB, OPM, and DOGE were *ultra vires* and thus violated the separation of powers. We consider first the claims as applied to the President and Executive Order 14210, and then as applied to the actions of OMB, OPM, and DOGE.

1

"The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). In the proceedings below, Defendants never argued that the Constitution was a proper source of authority for the Executive Order, relying solely on federal statutes governing agency authority. Having been rebuffed by the district court, they change tacks, now arguing that the Constitution does confer such authority. Both arguments are unavailing. Neither the Constitution nor any federal statute grants the President the authority to direct the kind of large-scale reorganization of the federal government at issue.

"Administrative agencies are creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam). Article I of the Constitution confers the legislative power exclusively on Congress. U.S. Const. art. I, § 1; *see Myers v. United States*, 272 U.S. 52, 129 (1926) (finding that Congress "under its legislative power is given the establishment of offices, [and] the determination of their functions and jurisdiction"). Accordingly, "Congress has plenary control over the salary, duties, and even existence of executive offices." *Free Enter. Fund*, 561 U.S. at 500.

"There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Instead, the President is tasked with "tak[ing] Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Defendants claim that this is all the President is doing here, casting the Executive Order as simply "giv[ing] policy

direction to executive agencies." But such a characterization is at best disingenuous, and at worst flatly contradictory to the record.

President Trump's Executive Order in no uncertain terms "commence[d] a critical transformation of the Federal bureaucracy," directing that "Agency Heads *shall* promptly undertake preparations to initiate large-scale reductions in force" and highlighting particular areas to be prioritized, including "all agency initiatives, components, or operations that [the Trump] Administration suspends or closes." The Order also instructed agency heads to submit within 30 days a report "discuss[ing] whether the agency or any of its subcomponents should be eliminated or consolidated." Agencies have followed suit, in some cases even specifically citing to the President's Executive Order in justifying their RIFs. *See, e.g.*, Dist. Ct. Dkt. No. 70-2 (notice at Department of Labor attributing RIF to § 3(c) of the Executive Order). Defendants cannot now assert that this language merely constituted guidance when, as the district court found, "[t]he evidence plaintiffs have presented tells a very different story: that the agencies are acting at the direction of the President and his team." *AFGE*, 2025 WL 1482511, at *21 (emphasis removed).

President Trump's Executive Order is thus wholly dissimilar to Executive Order 12839, promulgated in 1993 by President Clinton, which Defendants cite as an example of a President wielding reorganizational authority. That order required only that 4% of agency positions be "vacated through attrition or early out programs established at the discretion of the department and agency heads" over the course of three years. 58 Fed. Reg. 8515, 8515 (Feb. 10, 1993). Even setting aside the difference in scale, Executive Order 12839 did not involve mandatory RIFs or plans for

agency reorganization. Moreover, in March 1994—before any action was taken to reduce the federal workforce—Congress expressly authorized agencies to offer voluntary separation incentive payment programs to "avoid or minimize the need" for RIFs. *See* Federal Workforce Restructuring Act of 1994, Pub. L. 103-226, 108 Stat. 111, 113 (1994).

The Executive Order at issue here far exceeds the President's supervisory powers under the Constitution. The President enjoys significant removal power with respect to the appointed officers of federal agencies. *See, e.g.*, *Myers*, 272 U.S. 52; *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020); *see also Trump v. Wilcox*, No. 24A966, 2025 WL 1464804 (U.S. May 22, 2025). But even that power is not unlimited. *See, e.g.*, *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935). Determinative of the case before us, the President has never exercised such control over *inferior* officers, much less over the thousands of rank-and-file employees affected by the Executive Order.

The dissent argues that the district court "applied the wrong legal standard" in granting the preliminary injunction, and that "the question that should guide the separation of powers analysis" is whether the RIFs will essentially eliminate Congressionally created agencies or prevent those agencies from fulfilling their statutory duties. Dissent at 42–43. We do not agree with the dissent that this is the proper standard. But even applying the dissent's preferred standard, it is unlikely that Defendants can satisfy it. Defendants have not produced any evidence showing that the forty planned RIFs across seventeen agencies would not essentially eliminate Congressionally created agencies or prevent them from fulfilling their statutory duties. This lack of evidence is notable, given that Plaintiffs have produced evidence that

some of the RIFs contemplate dramatic and debilitating cuts to Congressional agencies, some of which we described above.  At a minimum, these cuts raise "serious questions going to the merits" of the question whether those agencies will be essentially eliminated or, if not eliminated, prevented from fulfilling their statutory duties.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

Further, even assuming *arguendo* that the President, acting alone, could direct agencies to engage in some specific, narrowly targeted RIFs, the RIFs at issue here are anything but that.  Instead, as the district court notes, they "appear inextricably intertwined with broad agency reorganization, which the president undoubtedly cannot undertake without Congress." *AFGE*, 2025 WL 1482511, at *22.  The staff of at least one agency, AmeriCorps, has been cut almost entirely, with 85% of staff having been given notices and placed on leave.  Dist. Ct. Dkt. No. 37-12.  Other agencies have been required to functionally eliminate entire functions or offices.  *See*, *e.g.*, Department of Labor, Dist. Ct. Dkt. No. 37-26 (cutting 90% of AFSCME-represented Office of Federal Contract Compliance Programs staff); Environmental Protection Agency, EPA, Dist. Ct. Dkt. No. 37-13, 37-19 (eliminating the Office of Environmental Justice and External Civil Rights); Health and Human Services, Dist. Ct. Dkt. No. 37-27 (cutting 93% of National Institute for Occupational Safety and Health staff): and Housing and Urban Development, Dist. Ct. Dkt. No. 37-7 (cutting nearly all positions in Office of Facilities and Property Management).

Defendants have yet to offer any evidence pointing to any explanation or justification for these sweeping RIFs beyond a general and undifferentiated desire for a reduction in the number of people on the government's payroll.  This

is not surprising, as it is difficult to imagine how the sheer volume of RIFs could be explained by any individualized need or purpose of a given agency.  Defendants repeatedly emphasize that "[f]ederal law . . . expressly authorizes agencies to undertake [reductions in force]."  But even to the extent that this may be true, it shows only that *Congress* has authorized federal agencies to "undertake [reductions in force]."  That has no bearing on the question here, which is not whether Congress has directed the agencies to engage in large-scale reductions-in-force, but whether Congress has authorized the *President* to direct the agencies to do so.  Defendants have not identified a federal statute granting such authority.  Indeed, in the supplemental motion now before us, they have abandoned any argument that the source of authority for the Executive Order may lie in statute.

Without any independent basis in the Constitution, the failure to identify statutory authority for the Executive Order is fatal to Defendants' claim.  Separation of powers and checks and balances are fundamental to the structure of the government established by our Constitution.  "To preserve those checks [on each Branch], and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded." *I.N.S. v. Chadha*, 462 U.S. 919, 957–58 (1983).  That is manifestly true here, where the kind of reorganization contemplated by the Order has long been subject to Congressional approval.  *See N.L.R.B. v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President." (internal quotation removed)).  We do not now recount that full history, which has been described at length by the district court, Plaintiffs, various *amici curiae*, and even

Defendants.  *See AFGE*, 2025 WL 1358477, at \*16–17.  But the most recent example of Congressional approval of reorganization authority warrants emphasis.

During the Reagan administration, Congress passed the Reorganization Act Amendments of 1984 ("Reorganization Act") "to promote . . . the more effective management of the executive branch," "to reduce expenditures and promote economy," and "to increase the efficiency of the operations of the Government."  Pub. L. No. 98-614, 98 Stat. 3192; 5 U.S.C. § 901(a).  The Act empowered the President to identify opportunities for organizational changes within agencies in accordance with the policy goals set forth by the statute.  *See* 5 U.S.C. § 903(a) ("Whenever the President . . . finds that changes in the organization of agencies are necessary *to carry out any policy set forth in section 901(a) of this title* . . . ." (emphasis added)).  That authority expired on December 31, 1984, and Congress has not renewed it.  *Id.* § 905(b).

What is particularly notable about the 1984 Act is that even under its broad grant of authority, the President's proposals for agency restructuring were subject to Congressional approval.  *See id.* §§ 903(b), 906(a).  Yet President Trump's Executive Order, not authorized under the 1984 Act or a comparable statute, implements precisely those types of changes.  For example, the Order directs agencies to engage in "large-scale reductions in force" prioritizing "all components and employees performing functions not mandated by statute or other law."  Under the Reorganization Act of 1984, the President's proposal regarding "the abolition of all or a part of the functions of an agency" would have needed Congressional approval, even if those functions were not part of an "enforcement function or statutory program."  5 U.S.C. § 903(a)(2).  In other words,

even if the President today were to have statutory reorganization authority such as that provided under the Reorganization Act—which he does not—his Executive Order would still violate the separation of powers.

None of this should be news to Defendants. During his first term in office, President Trump unsuccessfully sought this very reorganization authority he now seeks to exercise.[2] In 2018, two bills to this effect were introduced by Republican members in the House and Senate, but both failed. H.R. 6787, 115th Cong. (2017–2018); S. 3137, 115th Cong. (2018). In February of this year, Representative James Comer introduced the Reorganizing Government Act of 2025, seeking to resurrect and reenact the 1984 Reorganization Act statute. H.R. 1295, 119th Cong. (2025). That bill never became law. And, as just pointed out, even if it had become law, any reorganization plan promulgated thereunder would still have required approval from Congress before taking effect.

Finally, Defendants' invocation of *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), cannot save them. In *Fitzgerald*, the Supreme Court considered whether President Nixon was immune from a suit brought by a plaintiff who had lost his job in the Air Force during a departmental reorganization and reduction in force. The Court held that because the President's "mandate of office . . . include[d] the authority to prescribe reorganizations and reductions in force," plaintiff's termination fell within the broad blanket of executive immunity. *Id.* at 757. Defendants' reliance on that

---

[2] *See Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations* (June 21, 2018), https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.

sole line from *Fitzgerald* is inapposite. There, the Court relied on the President's "mandate" as arising from 10 U.S.C. § 9013(g), the provision governing the powers of the Secretary of the Air Force. *See id.* at 757. In the military context, Article II of the Constitution confers unique powers to the President as the Commander in Chief of the armed forces. U.S. Const. art. II, § 2. Indeed, if *Fitzgerald* did straightforwardly confer such reorganizational authority to the President, it is difficult to understand why President Trump sought that authority from Congress in 2018. It should thus come as no surprise that "[n]o President [other than President Trump] in the 40-plus years since *Fitzgerald* has used that case to justify reorganizing federal agencies more broadly." *AFGE*, 2025 WL 1482511, at *19.

As former Republican government officials note in their *amicus curiae* brief, the President cannot "reshape the entire federal bureaucracy because he does not like the tools that Congress has given him."

2

We turn next to the actions taken by OMB, OPM, and DOGE. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). As Defendants concede, OMB and OPM have only supervisory authority over the other federal agencies. *See* 31 U.S.C. §§ 501–07; 5 U.S.C. §§ 1101–05. DOGE has no statutory authority whatsoever. We therefore agree with the district court that these organizations' actions directing other federal agencies to engage in restructuring and large-scale RIFs were *ultra vires*.

In asking us to hold otherwise, the Defendants' only argument is that OMB, OPM, and DOGE were merely

"offer[ing] broad guidelines about the information to include in the [ARRPs]," not directing "what agencies should do." We disagree with that characterization.

Plaintiffs have submitted more than 1,400 pages of sworn declarations to the district court describing the actions of Defendants and their consequences. Dist. Ct. Dkt. No. 37, 101. They presented evidence of at least three instances in which agencies' proposed ARRPs were rejected by OMB, OPM, or DOGE as inadequate. Dist. Ct. Dkt. No. 36, Ex. 1 (NLRB); Dkt. No. 37-12 (AmeriCorps), 37-32 (NSF). By contrast, Defendants have actively sought to maintain secrecy over all of the ARRPs at issue in this case. The only piece of evidence they have publicly submitted is a single declaration in support of their motion for a protective order against the district court's order for those very ARRPs. Dist. Ct. Dkt. No. 88.

In considering the motion for a protective order, the district court has now conducted an *in camera* review of ARRPs from four different agencies and concluded that "OMB/OPM 'approval' . . . is a necessary triggering step in the agencies' current RIF and reorganization processes." *AFGE*, 2025 WL 1482511, at *21. At this time, our court does not have copies of, or access to, the materials that were considered *in camera* by the district court. "Our task in reviewing a district court's preliminary injunction decision is not to resolve [factual] controversies." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 795 (9th Cir. 2005). We thus review the court's factual findings only for clear error. *Id.*

Whatever the merits of the deliberative privilege claim now being considered below, it is remarkable that Defendants ask this court to reverse the district court's

findings when that court is the only court that has viewed the record upon which the government relies. Under clear error review, so long as the "district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it," even if "had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Here, there is simply no evidence that would allow us to assess the district court's weighing of the evidence.

Finally, we find unpersuasive Defendants' invocation of savings clauses in the Executive Order and Memorandum. Any language in the Executive Order or Memorandum purporting to limit their directives to what is statutorily authorized is belied by other language in these documents. "Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018). Both the language and practical impact of the Executive Order and Memorandum are clear: the Trump administration is directing a "critical transformation" of the federal agencies. Defendants' actions are thus *ultra vires*.

## C.  APA

Because success on their *ultra vires* claims would entitle Plaintiffs to the relief granted by the district court, we could again deny Defendants' motion for a stay on that ground alone. We nevertheless turn to the second set of Plaintiffs' claims, that the actions of the President, OPM, OMB, and DOGE violate the APA.

Because of the undeveloped record, the district court deferred ruling on the likelihood of success of several aspects of Plaintiffs' APA claims. *See AFGE*, 2025 WL 1482511, at \*24–25. The court found, however, that both the OMB/OPM Memorandum and OMB/OPM's approval of the ARRPs were final agency actions. *See id*. It then held that OMB and OPM violated the APA because these final actions (1) were "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and (2) constituted rule-making without notice and comment.

Defendants do not address the substance of Plaintiffs' APA claims, arguing that the OMB/OPM Memorandum is not a final agency action and is therefore unreviewable by the district court. We disagree.

1

For an agency action to be final, (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The finality of an agency action is "interpreted in a pragmatic and flexible manner." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995)); *see also Hawkes*, 578 U.S. at 599 ("This conclusion tracks the pragmatic approach we have long taken to finality." (internal quotation removed)). Both the Memorandum and OMB/OPM's approval of individual agencies' ARRPs satisfy this pragmatic and flexible finality standard.

As the district court found, nothing in the record indicates that OMB/OPM's actions are "of a merely tentative

or interlocutory nature." *Bennett*, 520 U.S. at 178; *see AFGE*, 2025 WL 1482511, at \*24–25.  The Memorandum set out a schedule of deadlines by which agencies were to submit ARRPs for approval, with the first phase being due just two weeks after the Memorandum was issued.  It was therefore "a definitive statement of [OMB/OPM]'s position" that "ha[d] a direct and immediate effect on the day-to-day operations" of the agencies, and with which "immediate compliance [wa]s expected." *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003).

Defendants now claim that the Memorandum merely "contemplates" the creation of the ARRPs and is thus "far afield" from the legal consequences that flow therefrom.  But we have held that "a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, *a decision by another administrative agency*, or conduct by a regulated party." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025) (emphasis added); *see also San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577–78 (9th Cir. 2019).  Moreover, Defendants make no argument against the district court's conclusion with respect to OMB/OPM's approvals of the ARRPs, which the district court found to be "a necessary triggering step in the agencies' current RIF and reorganization processes." *AFGE*, 2025 WL 1482511, at \*21.

As the district court acknowledged, the record is still limited as to the process for approving and implementing the agencies' ARRPs. *See id.* at \*25.  But neither we nor the district court have received a declaration or been shown any documentation suggesting that the Memorandum or the

approvals of the ARRPs did not represent OMB/OPM's "definitive position" on the matter. *Or. Nat. Desert Ass'n*, 465 F.3d at 985.   Absent such evidence, we find unpersuasive Defendants' assertions to the contrary.

2

Once we conclude that OMB/OPM's actions are final and subject to judicial review, it straightforwardly follows that the actions violate the APA.  For the reasons outlined in our analysis of Plaintiffs' *ultra vires* claims, both the Memorandum and approvals of ARRPs exceed OMB and OPM's statutory authority, in violation of 5 U.S.C. § 706(2)(A).  *See supra* Section II.B.2.  Because these were final agency actions that "create[d] new rights and impose[d] new obligations," they were required to be preceded by a public notice-and-comment period.  *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1088 (9th Cir. 2003); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); 5 U.S.C. § 553.

Defendants do not contest the merits of Plaintiffs' APA claims.  Other than reiterating their disagreement with the finding of finality, they do not object to the district court's conclusions.  Defendants therefore fail to show a likelihood of success on the merits with respect to Plaintiffs' APA claims.

### III.  Equitable Stay Factors

Having established that the first two factors, which "are the most critical," both weigh against granting a stay, we need say nothing more to justify a denial of Defendants' motion to stay the district court's decision pending appeal. *Nken*, 556 U.S. at 434.  We nonetheless turn to the third and fourth factors governing a request for a stay—"assessing the harm to the opposing party and weighing the public

interest"—which "merge when the Government is the opposing party." *Id.* at 435. Here, too, we have little trouble affirming the district court's conclusion that Plaintiffs would suffer irreparable injury in the absence of an injunction.

The declarations submitted by Plaintiffs in this case paint a startling picture of the "transformation" wrought by the Executive Order and its progeny. Most directly affected are, of course, the federal agency employees facing job loss. These employees number in the hundreds of thousands. Aside from the obvious economic harm of loss of salary, many of those affected will be left without healthcare. Others will be forced to relocate from their homes. *See AFGE*, 2025 WL 1482511, at \*26.

Plaintiffs' declarations also show the very substantial downstream impact of these large-scale reductions in force will have, reaching far beyond the walls of the executive agencies. Pulling a small handful of examples from the record, we point out that the current executive re-organization facilitates the proliferation of food-borne disease, Dist. Ct. Dkt. No. 37-46, 37-50, 37-58, contributes to hazardous environmental conditions, Dist. Ct. Dkt. No. 37-50, 37-52, 37-58, 37-59, hinders efforts to prevent and monitor infectious disease, Dist. Ct. Dkt. No. 37-21, 37-26, 37-46, 37-56, eviscerates disaster loan services for local businesses, Dist. Ct. Dkt. No. 37-18, 37-43, and drastically reduces the provision of healthcare and other services to our nation's veterans, Dist. Ct. Dkt. No. 37-9, 37-33, 37-38, 37-44, 37-58.

Defendants' only response is that "in the ordinary course, employment disputes brought by proper plaintiffs . . . rarely justify preliminary relief because there are procedures by which a terminated employee may obtain

back pay." The record indicates that what the Defendants have sought to do is anything but "in the ordinary course." Further, it is obvious that "back pay" is far from an adequate remedy. Back pay does not reinstate entire agency offices and functions. It cannot account for harms resulting from loss of income in the interim or for gaps in health- and childcare that accompany job loss. And it does nothing to address the breadth and severity of harm alleged by the dozens of non-federal-employee Plaintiffs in this case.

## IV.  Conclusion

For the foregoing reasons, we deny Defendants' emergency motion for a stay pending appeal.

---

CALLAHAN, Circuit Judge, dissenting:

Exercising his power over the Executive Branch and in furtherance of his initiative to reign in the size of the federal government, President Trump directed federal agencies to prepare and carry out large-scale reductions in force (RIFs). Plaintiffs sued, bypassing the comprehensive administrative scheme that Congress has enacted to handle federal sector labor and employment disputes. The district court nevertheless entertained Plaintiffs' claims and concluded that the Executive's actions likely violate separation of powers—without making any finding that any agency's RIF is likely to violate any statute. The court then entered a sweeping preliminary injunction that strips the Executive of control over its own personnel.

Because Defendants have shown a likelihood of success and irreparable harm, we should have stayed the preliminary injunction. I respectfully dissent.

## I.

As a threshold matter, Plaintiffs' claims are not justiciable.

"A special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)). Jurisdiction is precluded when the scheme "displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 207, 212)). That is the case here.

The Civil Service Reform Act of 1978 (CSRA) "established a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012) (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988)). Federal employees subject to a RIF may appeal to the Merit Systems Protection Board (MSPB), *see* 5 U.S.C. § 7701(a); 5 C.F.R. § 351.901, and then obtain judicial review in the Federal Circuit, 5 U.S.C. § 7703(b)(1). Additionally, within the CSRA, the Federal Service Labor-Management Relations Statute (FSLMRS) "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor management relations claims." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* (*Trump*), 929 F.3d 748, 755 (D.C. Cir. 2019) (citations and quotation marks omitted). Labor unions may bring their disputes before the Federal Labor Relations

Authority (FLRA), 5 U.S.C. § 7105(a)(2), whose decisions may be reviewed by the courts of appeals, *id.* § 7123(a).

Plaintiffs' claims, which effectively challenge the prospective termination of federal employees in the aggregate, are precluded by the CSRA. Indeed, several courts have already reached this conclusion in cases challenging recent actions by the Executive to reduce the size of the federal workforce. *See Maryland v. U.S. Dep't of Agric.*, Nos. 25-1248, 25-1338, 2025 WL 1073657, *1 (4th Cir. Apr. 9, 2025) (statutory scheme precluded challenge to terminations of thousands of federal probationary employees across federal agencies following Executive Order 14210); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352, 2025 WL 573762, at *7 (D.D.C. Feb. 21, 2025) (statutory scheme precluded challenge to placement on administrative leave of thousands of employees of the United States Agency for International Development (USAID) because "the alleged injuries on which plaintiffs rel[ied] in seeking injunctive relief flow[ed] essentially from their members' existing employment relationships with USAID"); *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-420, 2025 WL 561080, at *5-8 (D.D.C. Feb. 20, 2025) (statutory scheme precluded challenge to terminations of thousands of probationary employees, anticipated RIFs, and deferred-resignation program across federal agencies following three executive orders, including Executive Order 14210); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459, *2 (D. Mass. Feb. 12, 2025) (statutory scheme precluded challenge to deferred-resignation program across multiple agencies).

Although Plaintiffs raise constitutional arguments concerning separation of powers, that does not change the result. In *Elgin*, 567 U.S. 1, the plaintiffs' employment had

been terminated for failure to comply with statutes requiring federal employees to register for the draft. *Id.* at 7-8. Even though the MSPB could not resolve the plaintiffs' equal protection claim, the Supreme Court held that the CSRA's "statutory review scheme is exclusive, even for employees who bring constitutional challenges to federal statutes." *Id.* at 13. As the Court explained, the CSRA "replace[d] an 'outdated patchwork of statutes and rules' that [had] afforded employees the right to challenge employing agency actions in district courts across the country" and had "produced 'wide variations in the kinds of decisions . . . issued on the same or similar matters and a double layer of judicial review that was 'wasteful and irrational.'" *Id.* at 14 (quoting *Fausto*, 484 U.S. at 444-45). Thus, allowing the plaintiffs to pursue their equal protection claim outside of the CSRA would have "reintroduce[d] the very potential for inconsistent decisionmaking and duplicative judicial review that the CSRA was designed to avoid." *Id.*

Here, as in *Elgin*, the *Thunder Basin* factors point towards preclusion. First, whether claims are initially brought before the MSPB or the FLRA, the CSRA provides for meaningful judicial review of Plaintiffs' constitutional arguments in the federal courts of appeal. *See Elgin*, 567 U.S. at 16-21; *Trump*, 929 F.3d at 755-59 (absence of pre-implementation review did not bar meaningful review, even where plaintiffs claimed that executive orders violated the constitution). Second, Plaintiffs' constitutional arguments regarding the prospective termination of federal employees are not "wholly collateral" to the CSRA because challenges to adverse employment actions are "precisely the type of personnel action regularly adjudicated" within the scheme. *Elgin*, 567 U.S. at 22. Third, while Plaintiffs' constitutional arguments are outside the agencies' expertise, the MSPB and

FLRA may still apply their expertise to other claims raised by federal employees and their unions. *Id.* at 23; *see also Nat'l Treasury Emps. Union*, 2025 WL 561080, at \*8 ("[A]lthough the FLRA may lack expertise on the constitutional claims, the agency could 'moot the need to resolve the unions' constitutional claims' by finding that the President's actions violated the RIF statute." (citation omitted)).

Plaintiffs also argue that their claims are not precluded because the CSRA does not permit each of them to pursue its administrative remedies. But when Congress enacted the CSRA, it carefully prescribed who may challenge federal employment decisions (including federal employees and labor unions) and where they may bring their challenges (before the MSPB and the FLRA). The scheme's limitations are binding, even on the federal employees who are subject to federal employment decisions. *See Fausto*, 484 U.S. 439. Accordingly, it's unlikely Congress intended third parties who are only tangentially affected by federal employment decisions to have the right to attack those decisions directly in federal district courts.[1] *See Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1014 (D.C. Cir. 2009) ("Congress had no intention of providing claimants like these— unmentioned in the CSRA—with a level of access to the

---

[1] There are also serious questions whether all the non-federal-union Plaintiffs have standing. For example, the district court (which "reserve[d] a fuller analysis for another day") deemed it sufficient that the City of Baltimore has residents who are federal employees who might lose their jobs and who therefore might pay less in taxes. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-03698-SI, 2025 WL 1482511, \*10 (N.D. Cal. May 22, 2025). It cannot be the case that any individual or entity who might be remotely affected by a RIF has standing.

courts unavailable to almost any other federal employees, including those that the CSRA identifies as most worthy of procedural protection." (citation omitted)).**[2]**

## II.

Even if Plaintiffs' claims are justiciable, Defendants are likely to prevail.

Article II vests the President with authority over the Executive Branch. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" (quoting U.S. CONST. art. II, § 1, cl. 1; and citing *id.*, § 3)). His authority "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). And it "include[s] the authority to prescribe reorganizations and reductions in force." *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982).

Additionally, agencies have statutory authority to terminate employees, 5 U.S.C. § 3101, and to conduct RIFs, *id.* § 3502, and that statutory authority contemplates that agency RIFs may affect a "significant number of employees," *id.* § 3502(d)(1)(B). The Office of Personnel Management (OPM) in particular has statutory authority to

---

[2] Even assuming Plaintiffs' notice-and-comment claim could be brought outside of the CSRA framework, the district court's order does not address final agency action: it is the agency RIFs that determine "rights or obligations" and from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).

"prescribe regulations for the release of competing employees in a reduction in force," *id.* § 3502(a), and by regulation it "may examine [another] agency's preparations for reduction in force at any stage," 5 C.F.R. § 351.205. The Office of Management and Budget (OMB) also has statutory authority to "[f]acilitate actions" by "the executive branch to improve the management of Federal Government operations and to remove impediments to effective administration." 31 U.S.C. § 503(b)(4).

Through Executive Order 14210, the President pursued his policy objective of reducing the size of the federal government by directing the agencies to "promptly undertake preparations to initiate large-scale [RIFs], consistent with applicable law," and to prioritize "offices that perform functions not mandated by statute or other law." Exec. Order No. 14,210, 90 Fed. Reg. 9669, § 3(c) (Feb. 14, 2025). Subsequently, OMB and OPM issued a memorandum providing guidance on the implementation of the Executive Order and directing agencies to submit "Agency RIF and Reorganization Plans" for review and approval by specified deadlines. OMB & OPM, *Guidance on Agency RIF and Reorganization Plans* (Feb. 26, 2025). The memorandum provides that agencies "should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required services." *Id.* at 2. It also reiterates that agencies "should review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

The Executive Order and the memorandum are far from ultra vires. As the authorities cited above make clear, the President has the right to direct agencies, and OMB and OPM to guide them, to exercise their statutory authority to

lawfully conduct RIFs. *See generally Allbaugh*, 295 F.3d at 32-34.[3]  Yet the district court held otherwise, concluding that the Executive Order and the memorandum are likely ultra vires because they directed "large-scale" RIFs and "reorganizations." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-03698-SI, 2025 WL 1482511, *1 (N.D. Cal. May 22, 2025).  The court did not reach the question whether the RIFs will "essentially 'eliminate' Congressionally-created agencies or prevent those agencies from fulfilling their statutory mandates." *Id.* *19 n.18.

But that is the question that should guide the separation of powers analysis.  Surely the Executive, under the direction of the President, has substantial discretion over the management of its own personnel, including the number of personnel needed to ensure that the laws are faithfully executed.  *See Nixon*, 457 U.S. at 757.  So long as the Executive exercises that authority within the confines set by the Legislature, it cannot be said to usurp any legislative power.

The district court did make a general statement that "[i]n some cases, as plaintiffs' evidence shows, agency changes intentionally or negligently flout the tasks Congress has assigned them" and "[a]fter dramatic staff reductions, these agencies will not be able to do what Congress has directed them to do." *Id.* at *1.  In the footnote that follows, the district court "highlight[ed] a few examples" of "what is at stake in this litigation." *Id.* *1 n.1.  But the cited examples do not identify any statutory mandates.  For instance, the

---

[3] In *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018), an executive order's savings clause could not save it from a facial challenge.  But there, unlike here, the executive order "command[ed] action" that was unlawful. *Id.* at 1240.

court noted that RIFs have resulted in or may result in the closures of the Pittsburgh office of the National Institute for Occupational Safety and Health (NIOSH) or the San Francisco office of Head Start, but it did not assess whether those offices are statutorily required. *Id.* at 1 n.1. Additionally, the court observed that RIFs may result in delays in the provision of services by the Social Security Administration and the Farm Service Agency, but it did not analyze whether those delays amount to an abdication of statutory duties.

Because the district court failed to analyze and to make findings whether the RIFs likely have resulted or will result in statutory violations, it applied the wrong legal standard. Therefore, even if Plaintiffs' claims are justiciable, Defendants are likely to prevail in this appeal.

## III.

The remaining factors also favor a stay pending appeal, as in other recent cases enjoining Executive actions. *See, e.g.*, *Office of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*, No. 24A904, 2025 WL 1035208, at \*1 (U.S. Apr. 8, 2025) (granting stay pending appeal of preliminary injunction prohibiting termination of probationary employees); *Dep't of Educ. v. California*, 145 S.Ct. 966 (2025) (per curiam) (granting stay pending appeal of temporary restraining order mandating disbursement of funds).

The Executive undoubtedly has a legitimate interest in—and "has traditionally been granted the widest latitude in"—"the 'dispatch of its own internal affairs.'" *Sampson v. Murray*, 415 U.S. 61, 83 (1974) (quoting *Cafeteria and Rest. Workers Union, Loc. 473, A.F.L.-C.I.O. v. McElroy*, 367 U.S. 886, 896 (1961)). Despite this, the preliminary injunction is expansive—prohibiting approximately 20 agencies from

carrying out RIF-related activities, including interagency planning activities, as directed by the President—on the premise that any such activities related to the Executive Order are tainted. We should have been mindful of the limits of our own powers and stayed the injunction that interferes in the lawful conduct of a coordinate branch.

## IV.

Because we should have granted Defendants' motion to stay the preliminary injunction pending appeal, I respectfully dissent.