No. 25-3293

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,
*Defendants-Appellants.*

(full caption on inside cover)

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

CRAIG H. MISSAKIAN
  *United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

No. 25-3293

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AFGE LOCAL 1122; AFGE LOCAL 1236; AFGE LOCAL 2110; AFGE LOCAL 3172; SEIU LOCAL 521; SEIU LOCAL 1000; SEIU LOCAL 1021; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON DEFENSE CIVIC ENGAGEMENT; MAIN STREET ALLIANCE; NATURAL RESOURCES DEFENSE COUNCIL, INC.; NORTHEAST ORGANIC FARMING ASSOCIATION, INC.; VOTEVETS ACTION FUND INC.; WESTERN WATERSHEDS PROJECT; COUNTY OF SANTA CLARA, CALIFORNIA; CITY OF CHICAGO, ILLINOIS; COUNTY OF MARTIN LUTHER KING, JR., WASHINGTON; COUNTY OF HARRIS, TEXAS; CITY OF BALTIMORE, MARYLAND; and CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, *in his official capacity as Director of U.S. Office of Management and Budget*; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; CHARLES EZELL, *in his official capacity as Acting Director of the U.S. Office of Personnel Management*; UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY; ELON MUSK, *in his official capacity as the actual head of the Department of Government Efficiency*; AMY GLEASON, *in her official capacity as the titular Acting Administrator of the Department of Government Efficiency*; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, *in her official capacity as Secretary of the U.S. Department of Agriculture*; UNITED STATES DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of the U.S. Department of Commerce*; UNITED STATES DEPARTMENT OF DEFENSE; PETE HEGSETH, *in his official capacity as Secretary of the U.S. Department of Defense*; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, *in his official capacity as Secretary of the U.S. Department of Energy*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR., *in his official capacity as Secretary of the U.S. Department of Health and Human Services*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of the U.S. Department of Housing and Urban Development*; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, *in her official capacity as Attorney General of the U.S. Department of Justice*; UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, *in his official capacity as Secretary of the U.S. Department of the Interior*; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, *in her official capacity as Secretary of the U.S. Department of Labor*; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, *in his official capacity as Secretary of the U.S. Department of State*; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of U.S. Department of Treasury*; UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, *in his official capacity as Secretary for the U.S. Department of Transportation*; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; DOUG COLLINS, *in his official capacity as Secretary of Veterans Affairs*; AMERICORPS (a.k.a. the CORPORATION FOR NATIONAL AND COMMUNITY SERVICE); JENNIFER BASTRESS TAHMASEBI, *in her official capacity as Interim Agency Head of AmeriCorps*; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, *in his official capacity as Administrator of U.S. Environmental Protection Agency*; UNITED STATES GENERAL SERVICES ADMINISTRATION; STEPHEN EHIKIAN, *in his official capacity as Acting Administrator for U.S. General Services Administration*; NATIONAL LABOR RELATIONS BOARD; MARVIN KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*; WILLIAM COWEN, *in his official capacity as the Acting General Counsel of the National Labor Relations Board*; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, *in his official capacity as Acting Director of the National Science Foundation*; PEACE CORPS; ALLISON GREENE, *in her official capacity as Chief Executive Officer of the Peace Corps*; UNITED STATES SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, *in her official capacity as Administrator of the U.S. Small Business Administration*; UNITED STATES SOCIAL SECURITY ADMINISTRATION; and FRANK BISIGNANO, *in his official capacity as Commissioner of the Social Security*,

*Defendants-Appellants*.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION .............................................................................................. 1

STATEMENT OF JURISDICTION ................................................................. 2

STATEMENT OF THE ISSUE ......................................................................... 2

PERTINENT STATUTES AND REGULATIONS ........................................ 2

STATEMENT OF THE CASE .......................................................................... 2

    A.    Statutory and Regulatory Background ........................................ 2

    B.    Factual Background ......................................................................... 6

SUMMARY OF ARGUMENT ....................................................................... 12

STANDARD OF REVIEW .............................................................................. 15

ARGUMENT ..................................................................................................... 16

I.    The government is likely to succeed on the merits. ............................ 16

    A.    Plaintiffs' claims are not justiciable in district court ................. 16

    B.    Plaintiffs' challenges to the Executive Order are meritless ..................... 25

    C.    Plaintiffs' challenges to the Memorandum are meritless ......................... 33

II.    The balance of the equities favor the government. .............................. 35

CONCLUSION ................................................................................................. 37

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Advanced Integrative Med. Sci. Inst., PLLC v. Garland*,
24 F.4th 1249 (9th Cir. 2022) ........................................................ 23

*AFGE v. Secretary of the Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ........................................... 16, 17, 18

*AFGE v. Trump*,
No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025) .............. 11, 12, 17, 21, 22, 27, 30, 31

*AFGE v. Trump (Collective Bargaining Case)*,
929 F.3d 748 (D.C. Cir. 2019) ................................... 6, 16, 17, 20, 21

*Alder v. Tennessee Valley Auth.*,
43 F. App'x 952 (6th Cir. 2002) .................................................. 17

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ......................................................... 36

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
35 F.4th 1328 (Fed. Cir. 2022) .................................................... 29

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) .................................................................... 21

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................... 13, 22

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) ............................................................... 18, 22

*Bondi v. Vanderstok*,
145 S. Ct. 857 (2025) ................................................................. 28

*Bowsher v. Synar*,
478 U.S. 714 (1986) .................................................................... 29

*Building & Const. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ....................................................... 25

*California Cmtys.Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) ..................................................... 24

*Carr v. Saul*,
   593 U.S. 83 (2021) ................................................................ 21

*City & County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ................................................ 24, 25

*Duenas v. Garland*,
   78 F.4th 1069 (9th Cir. 2023) ................................................ 25

*Elgin v. Department of the Treasury*,
   567 U.S. 1 (2012) ................................................ 16, 19, 21

*Filebark v. U.S. Dep't of Transp.*,
   555 F.3d 1009 (D.C. Cir. 2009) ................................................ 22

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ................................................ 17, 21, 32

*Garcia v. United States*,
   680 F.2d 29 (5th Cir. 1982) ................................................ 36

*Gill v. DOJ*,
   913 F.3d 1179 (9th Cir. 2019) ................................................ 35

*Gill v. Whitford*,
   585 U.S. 48 (2018) ................................................ 36

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*,
   107 F.4th 1064 (9th Cir. 2024) ................................................ 29

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ................................................ 22

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
   560 F.3d 495 (D.C. Cir. 2009) ................................................ 19

*Hilton v. Sullivan*,
   334 U.S. 323 (1948) ................................................ 4

*James v. Von Zemenszky*,
   284 F.3d 1310 (Fed. Cir. 2002) ................................................ 3

*Kalispel Tribe of Indians v. U.S. Dep't of the Interior*,
   999 F.3d 683 (9th Cir. 2021) ................................................ 24

iii

*Karnoski v. Trump,*
   926 F.3d 1180 (9th Cir. 2019) ..................................................................... 15

*Keim v. United States,*
   177 U.S. 290 (1900) ...................................................................................... 4

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ..................................................................................... 36

*Markland v. OPM,*
   140 F.3d 1031 (Fed. Cir. 1998) ..................................................................... 4

*Maryland v. USDA,*
   No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ...................... 19, 35

*NFIB v. OSHA,*
   595 U.S. 109 (2022) ..................................................................................... 29

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) ....................................................................... 25, 30, 32

*Norton v. Southern Utah Wilderness All.,*
   542 U.S. 55 (2004) ....................................................................................... 23

*Nuclear Regul. Comm'n, v. Texas,*
   Nos. 23-1300 and 23-1312, 2025 WL 1698781 (U.S. June 18, 2025) ...................... 24

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce,*
   128 F.4th 1089 (9th Cir. 2025) ..................................................................... 23

*Sampson v. Murray,*
   415 U.S. 61 (1974) ................................................................................. 35, 36

*Soundboard Ass'n v. FTC,*
   888 F.3d 1261 (D.C. Cir. 2018) ................................................................... 24

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ..................................................................................... 20

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021) ......................................................................................... 32

*United States v. Fausto,*
   484 U.S. 439 (1988) ............................................................................ 5, 19, 21

*United Steelworkers of Am. v. Weber,*
　　443 U.S. 193 (1979) ............................................................. 27

*Winter v. Natural Res. Def. Council, Inc.,*
　　555 U.S. 7 (2008) ................................................................ 15

*Youngstown Sheet & Tube Co. v. Sawyer,*
　　343 U.S. 579 (1952) ............................................................ 26

**Statutes:**

Act of Aug. 15, 1876, ch. 287, 19 Stat. 1143 .................................. 4

Workforce Investment Act of 1998,
　　Pub. L. No. 105-220, § 134(a)(2)(A), 112 Stat. 936, 990 ............. 26

Pub. L. No. 78-359, 58 Stat. 387 ................................................... 5

Pub. L. No. 113-128, tit. V, 128 Stat. 1425 (2014) ........................ 26

5 U.S.C. § 301 ........................................................................... 29

5 U.S.C. § 704 ........................................................................... 22

5 U.S.C. §§ 1101-1104 ............................................................... 3

5 U.S.C. § 1204(a)(2) ................................................................. 6

5 U.S.C. § 1214(b)(1) ................................................................ 20

5 U.S.C. § 3101 ......................................................................... 33

5 U.S.C. § 3502 ................................................................ 3, 4, 8, 25, 26

5 U.S.C. § 3502(a) ...................................................................... 3

5 U.S.C. § 3502(d)(1)(A) ............................................................. 3

5 U.S.C. § 3502(d)(1)(B) ............................................................ 26

5 U.S.C. § 3502(d)(2)(E) ..................................................... 3, 25, 26

5 U.S.C. § 3502(d)(3)(A)(i) ........................................................ 26

5 U.S.C. §§ 7101-7135 ................................................................ 6

5 U.S.C. § 7103(a)(9) ............................................................... 18

5 U.S.C. § 7105(a)(2) ................................................................. 6

5 U.S.C. § 7121(a)(1) .............................................................. 18

5 U.S.C. § 7123(a) ..................................................................... 6

5 U.S.C. § 7512 .......................................................................... 6

5 U.S.C. § 7513(d) ..................................................................... 6

5 U.S.C. § 7701 .......................................................................... 6

5 U.S.C. § 7701(a) ........................................................ 4, 17, 20

5 U.S.C. § 7701(b)(1)(B) ........................................................... 6

5 U.S.C. § 7703 .......................................................................... 6

6 U.S.C. § 112(b)(1) ................................................................ 29

10 U.S.C. § 9013(g) ................................................................ 30

22 U.S.C. § 4010a(c) .............................................................. 17

28 U.S.C. § 1292(b) ................................................................... 2

28 U.S.C. § 1331 ................................................................. 2, 16

29 U.S.C. § 3174(a)(2)(A) ...................................................... 26

31 U.S.C. §§ 501-503 ................................................................ 2


**Regulatory Materials:**

5 C.F.R. pt. 351 ......................................................................... 3
    5 C.F.R. § 351.205 .......................................................... 3, 34
    5 C.F.R. pt. 351, subpart H .................................................. 8
    5 C.F.R. § 351.901 .......................................... 4, 6, 17, 20
5 C.F.R. § 1201.3(a)(6) ......................................................... 20

Exec. Order No. 12,839,
    58 Fed. Reg. 8515 (Feb. 12, 1993) ...................................... 5

vi

Exec. Order No. 14,158, § 1,
90 Fed. Reg. 8441 (Jan. 29, 2025) ................................................... 3

Exec. Order No. 14,173, § 3(b)(i),
90 Fed. Reg. 8633 (Jan. 31, 2025) ............................................... 27

**Rule:**

Fed. R. Civ. P. 4(a)(1)(B) ......................................................... 2

**Other Authorities:**

Admin. Conference of the U.S., *Appendix to Sourcebook of United States
Executive Agencies* (2d ed. Dec. 2018), https://perma.cc/YAW3-WSWK .......... 29-30

*Establishment of the Office of Environmental Justice,*
87 Fed. Reg. 33,174 (June 1, 2022) ............................................. 31

9 Fed. Reg. 9575 (Aug. 8, 1944) ................................................. 5

90 Fed. Reg. 9669 (Feb. 14, 2025) .............................................. 6

Elena Kagan, *Presidential Administration,*
114 Harv. L. Rev. 2245 (2001) ................................................. 32

*Memorandum of Agreement Between the Federal Trade Commission
and the Antitrust Division of the United States Department of
Justice Concerning Clearance Procedures for Investigations*
(Mar. 5, 2002), https://perma.cc/S3SK-RMUZ ..................................... 32

National Performance Review, *Serving the American Public:
Best Practices in Downsizing* (1997), https://perma.cc/7EA3-ZGSQ. ................ 5

*Office for Access to Justice,*
81 Fed. Reg. 43,065 (Jul. 1, 2016) ............................................ 31

OPM, Agency Services, *Reductions in Force,*
https://perma.cc/TQA4-HW64 .................................................... 34

*Reorganization Establishing the International Bureau,*
60 Fed. Reg. 5322 (Jan. 27, 1995) ............................................. 31

Soc. Sec. Admin., *Annual Data for Field Office Visitors*,
    https://perma.cc/K68M-LNZM ................................................................ 28

# INTRODUCTION

The district court entered a sweeping injunction preventing 19 federal agencies from carrying out an Executive Order directing them to undertake preparations for reductions in force (RIFs) consistent with applicable law. That was error.

At the threshold, plaintiffs' claims are not justiciable in district court. Congress has channeled federal-employment disputes of this type to a comprehensive review scheme, and, in any event, plaintiffs challenge an Executive Order and a related memorandum directing agencies to take certain preparatory steps, not any reviewable final agency action.

On the merits, the district court's injunction rests on a fundamentally flawed understanding of the separation of powers. The district court concluded that the President must have express congressional authorization to direct agencies to carry out RIFs. But agencies have statutory authority to conduct RIFs, and, of course, the President may tell agencies to use their own statutory authorities to accomplish policy goals. The district court questioned whether agencies may conduct RIFs at "large scale," but that limitation appears nowhere in the statutory text, and plaintiffs' speculation that agencies may violate their organic statutes in reducing their workforces provides no basis for the injunction. Plaintiffs have not made any showing, let alone the required strong showing, that they are likely to succeed.

The harms to the Executive Branch are apparent from the court's order, which halts nearly every executive department from taking steps to implement the President's policy priorities. This Court should thus vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. 2-ER-135. The district court entered a preliminary injunction on May 22, 2025. 1-ER-48-50. The government filed a timely notice of appeal on May 23, 2025. 3-ER-513; *see* Fed. R. Civ. P. 4(a)(1)(B). This court has jurisdiction under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUE

Whether the district court erred in enjoining implementation of an Executive Order directing federal agencies to prepare to undertake RIFs and as well as a related guidance memorandum, where plaintiffs have no likelihood of success on the merits and the equities tilt sharply against relief.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

**1.** The Office of Management and Budget (OMB) is a component of the Executive Office of the President that assists the President in preparing the budget and overseeing agencies. *See* 31 U.S.C. §§ 501-503. The Office of Personnel

Management (OPM) is an independent establishment in the Executive Branch that assists the President in overseeing the federal workforce. *See* 5 U.S.C. §§ 1101-1104. The U.S. DOGE Service (USDS) is an entity in the Executive Office of the President created to help advise and consult on the President's agenda of "modernizing Federal technology and software to maximize governmental efficiency and productivity." Exec. Order No. 14,158, § 1, 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025).

    **2.** Federal law expressly recognizes that the government may conduct RIFs, an "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). 5 U.S.C. § 3502 directs OPM to "prescribe regulations for the release of competing employees in a reduction in force." 5 U.S.C. § 3502(a). That statute further provides, among other things, for notice of a RIF to agency employees and their collective-bargaining representatives, including notice of "any appeal or other rights which may be available." *Id.* § 3502(d)(1)(A), (2)(E). OPM's detailed and longstanding RIF regulations, 5 C.F.R. pt. 351, address everything from the order of employee retention to competition for remaining positions. The regulations specify that "OPM may examine an agency's preparations for reduction in force at any stage" and require "appropriate corrective action." *Id.* § 351.205. "An employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board

3

[(MSPB)]." *Id.* § 351.901; *see* 5 U.S.C. § 7701(a) (authorizing MSPB review of any action made appealable by "law, rule, or regulation").

That statutory and regulatory scheme reflects Congress's longstanding recognition of federal agencies' authority to engage in RIFs. The first such statute, enacted in 1876, provided a veterans' preference, requiring any department head "making any reduction of force" to "retain those persons who may be equally qualified who have been honorably discharged from the military or naval service of the United States, and the widows and orphans of deceased soldiers and sailors." Act of Aug. 15, 1876, ch. 287, § 3, 19 Stat. 1143, 69; *see Hilton v. Sullivan*, 334 U.S. 323, 336-39 (1948) (summarizing history of veterans' preferences in RIFs). Courts have repeatedly rejected challenges to agencies' decisions to conduct RIFs, recognizing that such reductions are a matter of executive discretion. *See, e.g.*, *Keim v. United States*, 177 U.S. 290, 295 (1900) (statute authorizing RIFs "do[es] not contemplate the retention in office of a clerk who is inefficient, nor attempt to transfer the power of determining the question of efficiency from the heads of departments to the courts"); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) (an agency is accorded "wide discretion in conducting a reduction in force" (quotation marks omitted)).

As World War II concluded, it was widely understood that the federal government would need to shrink dramatically as the Nation shifted to a peacetime footing. Congress enacted the forerunner of 5 U.S.C. § 3502 in the Veterans' Preference Act of 1944, which directed that "[i]n any reduction in personnel in any

civilian service of any Federal agency, competing employees shall be released in accordance with Civil Service Commission regulations which shall give due effect to tenure of employment, military preference, length of service, and efficiency ratings." Pub. L. No. 78-359, § 12, 58 Stat. 387, 390; *see* 9 Fed. Reg. 9575 (Aug. 8, 1944) (promulgating Civil Service Commission RIF regulations).  In the decades since, the federal government has exercised its authority to conduct RIFs on numerous occasions.  In 1993, for example, President Clinton issued an executive order (entitled *Reduction of 100,000 Federal Positions*) that directed "[e]ach executive department or agency with over 100 employees [to] eliminate not less than 4 percent of its civilian personnel positions … over the next 3 fiscal years."  Exec. Order No. 12,839, § 1, 58 Fed. Reg. 8515, 8515 (Feb. 12, 1993).  The order required "[a]t least 10 percent of the reductions [to] come from the Senior Executive Service, GS-15 and GS-14 levels or equivalent," and imposed annual benchmarks for the elimination of positions. *Id.* §§ 1, 3.[1]

    **3**.  The Civil Service Reform Act (CSRA) "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees."  *United States v. Fausto*, 484 U.S. 439, 455 (1988).  Under the CSRA, most civilian employees can

---

[1] This order contemplated a large-scale "reduction" in the workforce, 58 Fed. Reg. 8515, which was implemented through a combination of separations pursuant to the RIF regulations and other means, National Performance Review, *Serving the American Public: Best Practices in Downsizing* 28 (1997), https://perma.cc/7EA3-ZGSQ.

appeal major adverse actions to MSPB.  5 U.S.C. §§ 7512, 7513(d), 7701.  Employees subject to RIFs may also pursue MSPB challenges, *see* 5 C.F.R. § 351.901, and seek relief including reinstatement with backpay, 5 U.S.C. §§ 1204(a)(2), 7701(b)(1)(B).  An employee aggrieved by a final decision of the MSPB may obtain judicial review in the Federal Circuit.  *Id.* § 7703.

Additionally, the Federal Service Labor–Management Relations Statute (FSLMRS) governs labor relations between the Executive Branch and its employees.  *See* 5 U.S.C. §§ 7101-7135; *AFGE v. Trump* (*Collective Bargaining Case*), 929 F.3d 748, 752 (D.C. Cir. 2019).  The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes.  5 U.S.C. § 7105(a)(2).  Review of FLRA decisions is available in the courts of appeals.  *Id.* § 7123(a).

### B.    Factual Background

**1.  a.**  In February, the President issued Executive Order No. 14210 directing "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law."  2-ER-243, § 3(c) (published at 90 Fed. Reg. 9669 (Feb. 14, 2025)).  The order sets priorities for how agencies carry out RIFs and prioritizes RIFs for "offices that perform functions not mandated by statute or other law."  *Id.*  It categorically exempts "functions related to public safety, immigration enforcement, or law enforcement."  *Id.*

The Executive Order separately address agency reorganization, providing that, by March 13, 2025, "Agency Heads shall submit to" OMB "a report that identifies any

statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," and that "discuss[es] whether the agency or any of its subcomponents should be eliminated or consolidated." 2-ER-243, § 3(e). The Executive Order emphasizes that agency heads need not consider reductions for "any position they deem necessary to meet national security, homeland security, or public safety responsibilities," 2-ER-243, § 4(b), and that the Order "shall be implemented consistent with applicable law and subject to the availability of appropriations," 2-ER-244, § 5(b).

**b.** About two weeks later, OPM and OMB jointly issued a guidance Memorandum to all executive-branch agencies. 2-ER-246-52. The Memorandum provided guidance on the principles that should inform the Plans, including objectives and priorities like providing "[b]etter service for the American people" and "[i]ncreased productivity." 2-ER-246-47. Furthermore, the Memorandum emphasized the need to comply with statutory mandates in conducting RIFs and reorganizations. *See, e.g.*, 2-ER-247 (urging agencies to "focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions" and to "review their statutory authority and ensure that their plans and actions are consistent with such authority").

The Memorandum directed each agency to submit a "Phase 1" Plan, focusing on "initial agency cuts and reductions," to OMB and OPM for review and approval

by March 13, 2025. 2-ER-248. It explained that "[e]ach Phase 1 [Plan] should identify," among other things, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated" and the "specific tools the agency intends to use to achieve efficiencies," such as regular employee attrition or "[a]ttrition achieved by RIFs"—and, as to the latter, "[t]he agency's target for reductions in [full-time] positions via RIFs." 2-ER-248-49. The Memorandum further directed the agency to submit a "Phase 2" Plan to OMB and OPM by April 14, 2025, which would "outline a positive vision for more productive, efficient agency operations going forward" and "be planned for implementation by September 30, 2025." 2-ER-249-51. The Phase 2 Plan would address such matters as the agency's "proposed future-state organizational chart" and plans for "subsequent large-scale RIFs." 2-ER-249-51.

The Plans do not themselves direct or implement any RIFs but instead describe RIFs that an agency intends to undertake. 2-ER-248-51. Agencies must then follow an established process to actually reduce their workforce, including providing 30- or 60-day notice, 2-ER-252. *See* 5 U.S.C. § 3502; 5 C.F.R. pt. 351, subpart H.

**2. a.** Plaintiffs are unions, advocacy organizations, and local governments. 2-ER-135-143. Eleven weeks after the President issued the Executive Order, they sued the President, OPM, OMB, USDS, and 21 federal agencies—including every Cabinet-level agency except the Department of Education. 2-ER-143-48. Plaintiffs alleged the President transgressed the separation of powers by directing agencies to prepare for RIFs, *see* 2-ER-224-25; that OMB and OPM usurped other agencies' statutory

8

authority by providing related guidance as the President directed, *see* 2-ER-225-33; and that notice-and-comment rulemaking was required for that interagency guidance, *see* 2-ER-230-31.

**b.** Plaintiffs moved for a "temporary restraining order," 3-ER-351-52, which the district court granted, 2-ER-253-94.[2] The government sought relief from this Court but dismissed its first appeal after the district court entered a preliminary injunction.

The district court's preliminary injunction recapitulated its analysis in granting the TRO, and the district court again granted relief. The district court held that at least some plaintiffs have standing, 1-ER-18, and that it could exercise general federal-question jurisdiction notwithstanding the CSRA and the FSLMRS, 1-ER-24, 1-ER-27. The district court then concluded that plaintiffs are likely to succeed on at least some of their *ultra vires* and Administrative Procedure Act (APA) claims. 1-ER-42, 1-ER-45. It viewed the Executive Order as *ultra vires* because "the President may broadly restructure federal agencies only when authorized by Congress," and Congress here has "passed no agency reorganization law for the President to execute." 1-ER-30, 1-ER-42. The district court also deemed it objectionable that "the agencies are acting at the *direction* of the President and his team," rather than making their own independent

---

[2] The district court also ordered the government to produce agencies' Plans. 2-ER-291-92. The production order (which the district court has stayed) is not at issue in this appeal.

judgments "about how [they] should conduct RIFs." 1-ER-37. The district court further found the Memorandum unlawful on the ground that OPM and OMB lack legal authority to order other agencies to terminate their employees or restructure their components. 1-ER-35-36. In addition, the court concluded that OPM and OMB "engaged in rule-making without notice and comment required by the APA, in issuing the … Memo[randum] and in approving the [Plans]," and that plaintiffs faced irreparable harm absent emergency relief. 1-ER-45-46.

Under the district court's order, OMB, OPM, USDS, and 19 agency defendants, as well as anyone else "acting under their authority or the authority of the President," are "enjoined and/or stayed from taking any actions to implement or enforce" the Executive Order or Memorandum. 1-ER-48-49. The enjoined actions "includ[e] but [are] not limited to," among other things, any approval or disapproval of agency RIF Plans and "any further implementation" of those Plans, such as through the issuance or execution of RIF notices and termination of agency employees, "to the extent [such actions] are taken to implement" the Executive Order or Memorandum. 1-ER-49. The court added that the enjoined agencies could "engag[e] in their own *internal* planning activities," but only "without the involvement of OMB, OPM, or DOGE." 1-ER-49. Although the court acknowledged that its order "provide[d] relief beyond the named plaintiffs," it deemed limiting the relief "impracticable and unworkable." 1-ER-48.

10

The district court further ordered the agency defendants to "rescind any RIFs issued pursuant to Executive Order 14210" and related placements of employees on administrative leave. 1-ER-50. The court stayed that retrospective relief pending appeal, but it otherwise denied applicants' request for a stay of the preliminary injunction. 1-ER-49.

**3.** The government appealed the preliminary injunction, 3-ER-513, and sought a stay pending appeal. On May 30, 2025, a divided motions panel of this Court denied the stay motion. *AFGE v. Trump*, No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025). The panel majority first found that applicants failed to show irreparable injury because the injunction is a "temporary preservation of the status quo" and "the money that is being spent" on employees that otherwise would be discharged "has already been appropriated by Congress." *Id.* at *2 (quotation marks omitted). The majority further concluded that the government is not likely to succeed on its jurisdictional objections or their merits defense of the Executive Order and Memorandum. *Id.* at *3-10. The majority emphasized that although it "may be true" that agencies have statutory authority to carry out RIFs, no "federal statute" "authorized the *President* to direct the agencies to do so." *Id.* at *7. The majority finally found that respondents' asserted harms outweighed the government and public interest in relief from the injunction. *Id.* at *11.

Judge Callahan dissented. *AFGE*, 2025 WL 1541714, at *11-15 (Callahan, J., dissenting). She explained, among other things, that respondents' claims "effectively

challenge the prospective termination of federal employees in the aggregate" and are accordingly precluded by an exclusive statutory scheme for review of such claims. *Id.* at *12; *see id.* at *13 n.2 (noting that respondents' APA claim also failed for lack of final agency action). On the merits, Judge Callahan concluded that the Executive Order and Memorandum "are far from ultra vires" because "the President has the right to direct agencies, and OMB and OPM to guide them, to exercise their statutory authority to lawfully conduct RIFs." *Id.* at *14. And she emphasized that "the district court failed to analyze and to make findings whether the RIFs likely have resulted or will result in statutory violations." *Id.* at *15. Finding that the remaining stay factors supported relief, Judge Callahan would have granted a stay of the district court's "expansive" injunction that "interferes in the lawful conduct of a coordinate branch." *Id.*.

**4.** The government applied to the Supreme Court for a stay of the preliminary injunction. *See Trump v. AFGE*, No. 24A1174 (U.S. filed June 2, 2025). That application remains pending.

## SUMMARY OF ARGUMENT

I. The government is likely to succeed on the merits.

A. Plaintiffs have brought the wrong claims in the wrong forum at the wrong time. The district court lacks jurisdiction to consider challenges to federal employment decisions. Congress has channeled such claims into an exclusive administrative scheme and thus precluded general federal-question jurisdiction over

plaintiffs' suit. The district court's assertion of jurisdiction would allow federal employees to avoid this exclusive review scheme merely by aggregating their claims and giving them a constitutional label. That is not the system Congress designed.

Plaintiffs also fail to point to a final agency action reviewable under the APA. The Memorandum fails to meet either of the requirements of finality. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The Memorandum does not mark the consummation of any decision-making process. It sounded the starting bell for a process of interagency dialogue, not the final whistle. And it does not have any legal consequences for any regulated parties. It simply guides agencies in how to carry out the Executive Order. Any actions that could have legal consequences must be undertaken by individual employing agencies. Plaintiffs' premature, whole-of-government challenge does not contest any action for which APA review may be had.

Nor can plaintiffs seek *ultra vires* review. They fail to satisfy that demanding standard because they cannot show that any of the acts they allege the President, OMB, or OPM have taken are expressly prohibited by any statute.

B. The President may tell executive agencies how to carry out their lawful functions, and agencies may lawfully conduct RIFs. Therefore, the President may tell agencies how to carry out RIFs including by telling them to prepare for large-scale RIFs. That resolves this case.

The district court ultimately acknowledged that the President may tell executive agencies how to implement his policy decisions, and that agencies have statutory

13

authority to implement at least some RIFs. But the district court held that the President acted unlawfully here in directing agencies to conduct RIFs at "large scale." The district court identified no statutory text that supports that limitation, and it gave no indication what constitutes a large-scale RIF compared to a small one. Contrary to the district court's understanding, the statutory text expressly contemplates "mass layoffs" resulting from RIFs.

Plaintiffs garner no more support in their turn to the idea that an agency may not conduct a RIF on a scale that would leave it unable to perform its functions. The Executive Order and Memorandum expressly require compliance with law. Plaintiffs fail to distinguish between statutory and non-statutory functions, and they presume to use an employment dispute to arrogate federal enforcement discretion from the President and agency heads. Plaintiffs fail to make the kind of showing required to establish that agencies will violate their organic statutes based on their staffing levels, let alone that the Executive Order is facially invalid.

C. Plaintiffs' attack on the Memorandum fares no better. OMB and OPM were created to help the President implement his agenda and oversee federal agencies and personnel. OPM has long exercised unchallenged authority to oversee RIFs and it routinely helps agencies conduct their own RIFs. Plaintiffs' allegations that OMB and OPM have usurped agencies' power to separate employees fail on their own terms. OMB and OPM are not separating employees or directing any terminations at other agencies. At best, plaintiffs' arguments show that OMB and OPM may object

14

to an agency's plan for its RIF, but that inter-agency process is consistent with OMB and OPM's functions and the Executive Order.

II. The other equitable factors favor the government. The district court's injunction is a sweeping intrusion on the government's personnel-management operations, and it has prevented the government from separating many employees even though their employing agencies have determined they no longer require their services. As a result, the government is needlessly paying out millions of dollars in salary and benefits every week. And because the district court required plaintiffs to post a bond of only $10—not even enough to cover a single hour of wages for the lowest paid federal employee—the government can never recover those wasted funds. The district court compounded its error by entering an injunction that it admits is broader than required to redress plaintiffs' injuries, which themselves do not amount to irreparable harm.

## STANDARD OF REVIEW

To obtain a preliminary injunction, plaintiffs must show that they are likely to succeed on the merits, that they would suffer irreparable harm absent a preliminary injunction, and that the balance of the equities and the public interest favor an injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court reviews the grant of a preliminary injunction "for abuse of discretion, but review[s] any underlying issues of law de novo." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (per curiam).

15

## ARGUMENT

## I. The government is likely to succeed on the merits.

### A. Plaintiffs' claims are not justiciable in district court.

Plaintiffs brought their claims in the wrong forum challenging the wrong actions at the wrong time.

**1.** The district court lacks subject-matter jurisdiction to adjudicate challenges to agencies' employment decisions.

**a.** Congress has "established a comprehensive system" as the "exclusive means" for reviewing such matters. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted). The CSRA, together with the FSLMRS, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (cleaned up). Congress allowed certain individual federal employees to challenge agency personnel decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, albeit limited to the claims and remedies provided by Congress. *See Collective Bargaining Case*, 929 F.3d 748, 757 (D.C. Cir. 2019). Such an alternative scheme displaces district court jurisdiction under 28 U.S.C. § 1331 if it "displays a fairly discernible intent to limit jurisdiction, and the claims at issue are of the type Congress intended to be reviewed

16

within the statutory structure." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (cleaned up).

The district court acknowledged this comprehensive scheme, 1-ER-20-21, but erroneously concluded that plaintiffs' claims fall outside it. At bottom, this case is a dispute concerning "employee relations in the federal sector" and "federal labor-management relations," the subject matters that Congress enacted the CSRA and FSLMRS to govern. *Collective Bargaining Case*, 929 F.3d at 755 (quotation marks omitted). Plaintiffs seek to preemptively challenge agencies' RIF decisions. 2-ER-176-224; *see AFGE v. Trump*, No. 25-3293, 2025 WL 1541714, at *12 (9th Cir. May 30, 2025) (Callahan, J., dissenting) ("Plaintiffs' claims … effectively challenge the prospective termination of federal employees in the aggregate … ."). But federal employees who believe a RIF has violated a statute or regulation may seek redress only through the MSPB, *see* 5 U.S.C. § 7701(a); 5 C.F.R. § 351.901, or another specialized scheme for administrative review, *e.g.*, 22 U.S.C. § 4010a(c). *See also Alder v. Tennessee Valley Auth.*, 43 F. App'x 952, 956 (6th Cir. 2002) ("[A] challenge to [a] reduction-in-force decision" is "a fundamental employment claim subject to MSPB review."). Plaintiffs may not evade this scheme by bringing claims as unions asserting harms to their individual members or asserting a loss of membership dues. Otherwise, any unionized employee "could circumvent the CSRA's strictures." *See Air Force*, 716 F.3d at 639.

17

Moreover, the FSLMRS "establishes a comprehensive scheme to deal with labor relations in federal employment," which channels adjudication to the FLRA followed by direct review in the courts of appeals. *Air Force*, 716 F.3d at 636 (quotation marks omitted). Under the FSLMRS, unions may file a grievance under preexisting collective bargaining agreements "concerning any matter relating to the employment of any employee," "the effect or interpretation, or a claim of breach, of a collective bargaining agreement," or "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. §§ 7103(a)(9), 7121(a)(1).

These comprehensive provisions foreclose the union plaintiffs' attempt to raise their labor dispute in district court. And for the same reason, the claims cannot be brought by the non-union plaintiffs who assert downstream harms from agencies' employment decisions. When a comprehensive remedial scheme permits review at the behest of some types of plaintiffs but not others, the proper inference is that the excluded parties cannot bring claims at all. In *Block v. Community Nutrition Institute*, for instance, the Supreme Court considered a statute that permitted dairy handlers—but not consumers—to obtain review of "market orders." 467 U.S. 340, 346 (1984). When consumers sought review, the Supreme Court explained that "[i]n a complex scheme of this type, the omission of such a provision [permitting consumers to participate] is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

These principles apply to the CSRA. In *United States v. Fausto*, the Supreme Court applied *Block* to conclude that federal employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that [law]." 484 U.S. 439, 448 (1988). As the Court explained, "the absence of provision for these employees to obtain judicial review" is a "manifestation of a considered congressional judgment that they should not have statutory entitlement to review." *Id.* at 448-49. And more recently, after a district court enjoined the termination of various federal employees in litigation brought by state governments, the Fourth Circuit entered a stay pending appeal because the government was "likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims." *Maryland v. USDA*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025).

Thus, to the extent plaintiffs here cannot invoke the specialized review schemes, that does not entitle them to circumvent the limits on those schemes and sue in district court. *See Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (Kavanaugh, J.). Nor can they evade the CSRA by agglomerating many individual employment actions into one complaint, or by challenging an Executive Order and seeking to raise constitutional claims, *see Elgin*, 567 U.S. at 17.

**b.** The district court's aberrant jurisdictional analysis was unsound. The court reasoned that precluding this action would "foreclose meaningful judicial review" because plaintiffs seek to challenge, on a pre-implementation basis, "'large-scale

19

reductions in force' happening rapidly across multiple agencies." 1-ER-24-25. But *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994), held that district-court jurisdiction was precluded by a statutory scheme that did not permit pre-enforcement review at all. *Collective Bargaining Case*, 929 F.3d at 755-56. The prospect that plaintiffs will be unable to "continue business as usual" during the pendency of administrative proceedings, 1-ER-25, does not render meaningful judicial review unavailable, just as it did not do so in *Thunder Basin*. *See* 510 U.S. at 216-18 (mining company had to give union representatives access to premises or incur civil penalties pending administrative proceedings). The direct harm caused by the challenged conduct— employee terminations in allegedly unlawful RIFs—is remediable, and this is precisely the type of conduct that Congress intended to be remedied through the CSRA's processes. In any event, the district court disregarded the statutory authority of "any member" of the MSPB to grant stays pending further proceedings in certain circumstances. 5 U.S.C. § 1214(b)(1).

The district court further suggested that it was "unlikely" that Congress intended to channel review of RIF claims because "employees' rights to appeal a RIF to the [MSPB] come not directly from statute but from regulation." 1-ER-26; *see* 5 C.F.R. §§ 351.901, 1201.3(a)(6). That reasoning is untenable, however, because Congress itself expressly authorized MSPB review of "any action which is appealable to the Board under any law, rule, *or regulation*." 5 U.S.C. § 7701(a) (emphasis added).

Under the statute's plain terms, the same channeling requirements apply to all such actions, regardless of the particular source of the right to appeal to the MSPB.

The district court and the motions panel majority also emphasized that plaintiffs raise "fundamental questions of executive authority and separation of powers," "not the individual employee or labor disputes [the MSPB and FLRA] customarily handle." 1-ER-24, 26-27; *see AFGE*, 2025 WL 1541714, at *3-5. But the Supreme Court has already held that the CSRA channels review of fundamental questions of constitutional law. *See Elgin*, 567 U.S. at 22-23; *accord Collective Bargaining Case*, 929 F.3d at 760-61. For good reason: When the federal government is the employer, practically any employment or labor-management-relations claim can be dressed up in constitutional garb. This case bears no resemblance to those invoked by the motions panel majority, in which litigants brought "constitutional challenges" to the "structur[e]" of the relevant administrative bodies themselves. *AFGE*, 2025 WL 1541714, at *4 (quoting *Carr v. Saul*, 593 U.S. 83, 92 (2021)); *see Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Free Enter. Fund*, 561 U.S. at 491.

Finally, the district court noted that even if the unions and their federal-employee members could seek relief under the FSLMRS and CSRA, the other plaintiffs could not. 1-ER-27-28; *see also AFGE*, 2025 WL 1541714, at *5. As discussed above, however, the Supreme Court has previously rejected a similar attempt to narrow the CSRA's preclusive scope based on the CSRA's limited remedies. *See Fausto*, 484 U.S. at 447-55 (CSRA precluded an employee's suit for

21

backpay despite the unavailability of CSRA review); *see supra* p. 19. "[I]t is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies," that precludes jurisdiction; accordingly, even where "the CSRA provides no relief," it "precludes other avenues of relief." *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (quotation marks omitted); *see Block*, 467 U.S. at 346-347. Given that the CSRA precludes federal employees and their unions from themselves going to court even to raise claims or remedies that the CSRA does not recognize, it would be perverse to read the CSRA to permit third parties who are at most "tangentially affected by federal employment decisions to have the right to attack those decisions directly in federal district courts" outside the CSRA process. *AFGE*, 2025 WL 1541714, at *13 (Callahan, J., dissenting) (citing *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1014 (D.C. Cir. 2009)).

**2. a.**  Further, plaintiffs do not identify final agency action reviewable under the APA.  The APA applies only to final agency action and excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]."  5 U.S.C. § 704.  To be final, an agency action (1) "must mark the 'consummation' of the agency's decisionmaking process," and (2) determine "rights or obligations" or have "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted).  The Memorandum satisfies neither criterion.[3]  The Memorandum is an internal document

---

[3] Plaintiffs do not challenge the Executive Order under the APA.  2-ER-307.

that simply begins an iterative process between agencies and OPM and OMB. It contemplates the creation of planning documents, which themselves may lead to final agency actions, but the Memorandum itself is far afield from any action that has legal consequences and directly affects plaintiffs. The APA does not permit this type of "wholesale" attack on an agency program; rather, plaintiffs must point to "some particular 'agency action' that causes [them] harm," and they have failed to do so. *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (cleaned up).

**b.** The district court erred in concluding that the Memorandum embodies a final action in two ways. First, the district court held that the Memorandum marks the consummation of a process because it is not "in draft form." 1-ER-43. By definition, a draft document does not embody final agency action. But the converse is not invariably true. Many documents are not in draft form yet nevertheless do not memorialize final agency actions. *See, e.g., Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1260 (9th Cir. 2022) (letter sent to regulated party). To be sure, "an agency action *can* be final even if its legal or practical effects are contingent on a future event." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025) (emphasis added) (cleaned up). By definition, however, contingency does not invariably mean finality. Rather, the critical point is that the Memorandum is the start of the process not the end of it.

Second, the district court erred in its apparent determination that the Memorandum has legal consequences. *See* 1-ER-44. The second *Bennett* prong

23

examines finality "from the regulated parties' perspective." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018). Here, where the Memorandum is directed only to agencies and, at most, represents a final view as to the content of Plans—subject to further inter-agency consultation—there is no impact on any regulated parties. Because "it does not require anyone" outside of government "to do anything" and cannot be "rel[ied] on in any proceeding," it does not satisfy the second *Bennett* prong. *California Cmtys.Against Toxics v. EPA*, 934 F.3d 627, 638, 640 (D.C. Cir. 2019).

**3.** Nor can plaintiffs proceed on an *ultra vires* claim outside of the APA. *Ultra vires* claims require a showing that government officials act "without any authority whatever." *Kalispel Tribe of Indians v. U.S. Dep't of the Interior*, 999 F.3d 683, 691 (9th Cir. 2021) (quotation marks omitted); *see also Nuclear Regul. Comm'n, v. Texas*, Nos. 23-1300 and 23-1312, 2025 WL 1698781, at *9 (U.S. June 18, 2025) (holding that ultra vires review is avaliable "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute" (cleaned up)). Here, however, both the Executive Order and the Memorandum expressly require agencies to act in accordance with statutory authority and relevant appropriations. 2-ER-244, § 5(b); 2-ER-248. And no statute expressly prohibits the President from directing agencies to prepare for RIFs or prohibits OBM or OPM from providing guidance on RIFs to agencies.

*City & County of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018), does not establish otherwise. Although the Court in that case declined to give effect

24

to an executive order's savings clause, that holding was based on the Court's conclusion that the order had *no* legitimate applications, and so giving effect to the savings clause would effectively negate the order. *Id.* That is not the case here, *see infra* pp. 26-32, so plaintiffs' challenge fails. *See Building & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

### B. Plaintiffs' challenges to the Executive Order are meritless.

The district court erred in concluding that the President acted *ultra vires* in directing agencies to take steps to reduce the size of their workforce. Congress expressly authorized agencies to conduct RIFs, 5 U.S.C. § 3502, as the district court recognized, 1-ER-38. And the President may undoubtedly tell agencies to examine their statutory authorities and take steps to implement his policy priorities. Indeed, the President's "'ongoing supervision and control' of executive officials legitimizes the power that they exert in his or her name." *Duenas v. Garland*, 78 F.4th 1069, 1072 (9th Cir. 2023). As the Supreme Court has recognized, "[i]t clearly is within the President's constitutional and statutory authority to prescribe the manner in which" his subordinates conduct their business, and "this mandate of office must include the authority to prescribe reorganizations and reductions in force." *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982). The President did not contravene the separation of powers in directing agencies to carry out RIFs consistent with applicable law.

The district court acknowledged that agencies have statutory authority to conduct RIFs, 1-ER-38, and that the President may give policy direction to agencies,

1-ER-2. In this context, therefore, the President's authority is at its apex. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (1952) (Jackson, J., concurring). The court's conclusion that the President nevertheless lacked authority to issue the Executive Order rests on several mistaken premises.

The district court's holding that the President may not direct a "large-scale" RIF, 1-ER-31, 1-ER-35, has no basis in law. Federal law expressly authorizes agencies to undertake RIFs, and does not impose a numerical cap—let alone an amorphous "large-scale" limitation. *See* 5 U.S.C. § 3502. Indeed, § 3502 expressly contemplates that some RIFs will affect a "significant number of employees." *Id.* § 3502(d)(1)(B). In such a case, the agency must provide advance notice to the relevant State or its designee, *id.* § 3502(d)(1)(B), (d)(3)(A)(i), under a law that allows States to use emergency funds respond to, inter alia, "mass layoffs," Workforce Investment Act of 1998, Pub. L. No. 105-220, § 134(a)(2)(A), 112 Stat. 936, 990.[4] A "large" RIF that comports with the agency's statutory structure and function is just as lawful as a "small" one; the district court created its contrary limitation out of whole cloth.

For similar reasons, the district court erred in concluding that in directing agencies to undertake RIFs consistent with federal law, 2-ER-244, § 5(b), the Executive Order somehow requires agencies to undertake "reorganizations" of agency structures that are contrary to law, 1-ER-40-42. The Executive Order does not direct

---

[4] The relevant provision is now codified at 29 U.S.C. § 3174(a)(2)(A). *See* Pub. L. No. 113-128, tit. V, § 513(a), 128 Stat. 1425, 1722 (2014).

any particular reorganization of any agency. And it certainly does not foreclose the possibility of seeking any statutory amendment that an agency concludes that is appropriate to best execute its mission. Plaintiffs' speculation that certain agency components may not be able to perform their duties with reduced staffing levels, *e.g.*, 2-ER-178, is premature and insufficient to entitle them to the extraordinary remedy of a preliminary injunction. Indeed, the district court was able to conclude only that it had "significant questions" about agencies' "capacities to fulfill their statutory missions." 1-ER-41. Nor did the district court attempt to explain how even assuming that an agency's RIF might impair its ability to discharge its statutory functions, that potential impairment would deprive an agency of its RIF authority, let alone support universally enjoining the implementation of an Executive Order that directs agencies to comply with their statutory obligations.

The examples of alleged statutory violations plaintiffs point to demonstrate the weakness of their arguments. For instance, embracing one of plaintiffs' arguments, *see* 2-ER-178, the motions panel highlighted cuts in the Department of Labor's Office of Federal Contract Compliance Programs, *AFGE*, 2025 WL 1541714, at *7, without recognizing that a principal provision the office was charged with enforcing (a 1965 executive order) was recently revoked. *See* Exec. Order No. 14,173, § 3(b)(i), 90 Fed. Reg. 8633, 8634 (Jan. 31, 2025) (revoking Executive Order 11,246); *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 223 n.2 (1979) (Rehnquist, J., dissenting). Similarly, it is far-fetched to suggest that the Social Security Administration's plan to close "up to 47

field offices," 2-ER-143, risks violating congressional directives when there are more than 1,200 such offices nationwide, Soc. Sec. Admin., *Annual Data for Field Office Visitors*, https://perma.cc/K68M-LNZM. These examples highlight the baselessness of plaintiffs' speculation that the RIFs may prevent agencies from complying with their statutory functions. They also underscore the error of litigating the issue through a government-wide pre-enforcement action.

Of course, if an agency were to undertake specific actions in implementing a RIF that contravened a statutory command—and thus contravene the Executive Order, which directs agencies to follow applicable law—a proper plaintiff may be able to challenge that action in the appropriate forum. But plaintiffs bring a facial challenge to an Executive Order and Memorandum, which explicitly direct and contemplate compliance with statutory law. Even if an individual application of those directives could be invalid as the district court suggests, 1-ER-41, that lapse would not render the Executive Order and Memorandum invalid on their face, *see Bondi v. Vanderstok*, 145 S. Ct. 857, 865-66 (2025). That certain offices may be reduced does not mean that agencies' functions cannot be performed. There are any number of changes that agencies may effectuate without congressional action, such as creating or eliminating field offices or centralizing or dispersing IT staff. *E.g.*, 3-ER-378. The district court's unwarranted speculation that agencies may deviate from the Executive Order's directives and exceed statutory bounds in reducing their workforces could not support even a narrow injunction, let alone the sweeping one here.

28

The district court also pointed to the expiration of the most recent Reorganization Act to conclude that absent such authority, the President cannot "reorganize" an agency. 1-ER-30-33. But reorganization authority is a red herring. "Administrative agencies," of course, "are creatures of statute." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). Absent congressional specification, however, an agency's priorities and structure are details that Congress left to the Executive Branch to implement. Congress has empowered each department head to "prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business." 5 U.S.C. § 301. This general housekeeping authority allows agencies to structure themselves as they see fit and to employ such staff as they require, subject to other statutory constraints. That general grant of authority is not an unusual arrangement: implementing statutes by filling in such details lies at the core of the executive power, *see Bowsher v. Synar*, 478 U.S. 714, 732-33 (1986), and most agencies also possess more specific statutory authorities to determine their own staffing and structure, *see, e.g.*, 6 U.S.C. § 112(b)(1) (Department of Homeland Security); *see also Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1337-38 (Fed. Cir. 2022) (recognizing general authority of agency heads to delegate functions within agencies); *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*, 107 F.4th 1064, 1076 (9th Cir. 2024) (same). And dozens of subagencies were never established by Congress at all. *See generally* Admin. Conference of the U.S., *Appendix to Sourcebook of United States Executive Agencies* (2d ed. Dec. 2018),

29

https://perma.cc/YAW3-WSWK (detailing more than 60 components "[n]ot established in U.S. Code").

It follows that the President may direct agencies to exercise this authority by "prescrib[ing] reorganizations and reductions in force," as the Supreme Court has expressly recognized. *See Fitzgerald*, 457 U.S. at 757. The district court's assertion, 1-ER-34, that *Fitzgerald* relied on the President's commander-in-chief powers misapprehends that decision; the motions panel majority similarly erred, *AFGE*, 2025 WL 1541714, at *8. The statutory authority cited in *Fitzgerald* (now codified at 10 U.S.C. § 9013(g)) was the Air Force's general housekeeping provision, and nothing about the Supreme Court's analysis turned on the President's military authority or whether he was directing a military or civilian agency. It is hard to see how it could be otherwise because Ernest Fitzgerald was a civilian employee.

That agencies may sometimes reorganize themselves without express Congressional approval does not mean that prior Presidents and Congresses "did not properly understand the separation of powers" in seeking and granting reorganization authority. *Contra* 1-ER-4; *AFGE*, 2025 WL 1541714, at *8. Congress may legislate even where legislation is not necessarily required. And because *some* changes to agency structure might require statutory changes, such as the elimination of statutorily required functions, Presidents benefit from having fast-track procedures for such legislation. Thus, it is *not* at all "difficult to understand why President Trump sought that authority from Congress in 2018." *Contra AFGE*, 2025 WL 1541714, at *8. But

30

not *all* changes require an Act of Congress, and the President is not disabled from overseeing executive agencies without new legislation.

The district court underscored its error by holding that "even if agencies consider all their organic statutory mandates, the executive branch still cannot reorganize at this scale without authority from Congress." 1-ER-41; *see AFGE*, 2025 WL 1541714, at *15 (Callahan, J., dissenting) ("Because the district court failed to analyze and to make findings whether the RIFs likely have resulted or will result in statutory violations, it applied the wrong legal standard."). By definition, if agencies comply with all relevant statutes, they are following the law. Some agency programs are created and required by statute; others, however, are merely efforts undertaken by agencies within their jurisdictions to pursue policy goals. Agencies are allowed to disband non-statutory programs they no longer support and to institute programs that align with their agenda. *See, e.g.*, *Establishment of the Office of Environmental Justice*, 87 Fed. Reg. 33,174 (June 1, 2022) (creating new office within Department of Health and Human Services to implement Executive Order 14,008); *Office for Access to Justice*, 81 Fed. Reg. 43,065 (Jul. 1, 2016) (creating new office within Department of Justice); *Reorganization Establishing the International Bureau*, 60 Fed. Reg. 5322 (Jan. 27, 1995) (abolishing office and creating bureau with Federal Communications Commission). And agency heads may look to the President for direction in deciding which programs to maintain, which to eliminate, and which to add. In that way, agencies are responsive to democratic inputs.

31

The district court, however, rejected that basis proposition of self-government. Instead, the district court took the errant view that the prospect of executive-branch "agencies … acting at the *direction* of the President and his team" was itself "evidence" of "unlawful action." 1-ER-37. The Constitution, however, undoubtedly allows the President to give policy direction to executive agencies, *see United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021); *see generally* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001), including with respect to RIFs, *see Fitzgerald*, 457 U.S. at 757. The President's power to supervise agencies lies at the heart of his executive authority. Our constitutional structure presumes that the President is "responsible for the actions of the Executive Branch," *Free Enter. Fund*, 561 U.S. at 496-97 (quotation marks omitted). No statute need authorize him to convey his policy choices to agencies.

Nor is there anything legally wrong with transferring functions between agencies, so long as the agencies enjoy overlapping statutory authorities, as many do. For instance, no statute bars the Department of Justice and the Federal Trade Commission from rearranging their areas of responsibility for antitrust enforcement. *See, e.g.*, *Memorandum of Agreement Between the Federal Trade Commission and the Antitrust Division of the United States Department of Justice Concerning Clearance Procedures for Investigations* (Mar. 5, 2002), https://perma.cc/S3SK-RMUZ. Plaintiffs allude to planned interagency transfers of functions without providing detail or doing anything to substantiate their implication that such transfers would be unlawful. Yet the

32

district court credited those unsubstantiated allegations without determining the lawfulness of any such transfer. *See* 1-ER-42.

**C.    Plaintiffs' challenges to the Memorandum are meritless.**

**1.** The district court's interpretation of the Memorandum rests on the mistaken premise that OMB, OPM, and USDS have stolen statutory power from other agencies. In particular, the court district erroneously reasoned that OMB, OPM, and USDS are ordering agencies to engage in RIFs. 1-ER-37-38.

It is common ground that Congress empowered agencies to hire and fire their own employees. 5 U.S.C. § 3101. In exercising that authority, however, agencies properly take direction from the President. And the President may ask OMB, OPM, and his advisors in USDS to review agencies' personnel plans and provide guidance, which is all that occurred here. That sort of interagency dialogue happens every day in the federal government and is not nefarious; it is how the system is supposed to work.

Plaintiffs' reliance on the Memorandum's statement that agencies should submit Plans to OMB and OPM for "review and approval," 2-ER-248-49, misapprehends the role of OMB and OPM. Individual agencies (not OPM and OMB) are in charge of crafting and implementing their Plans and of making decisions regarding RIFs. The Memorandum offers broad guidelines about the information to include in the Plans—not what agencies should do. Underscoring this, the Executive Order explains that it shall not "be construed to impair or otherwise affect … the

33

authority granted by law to an executive department, agency, or the head thereof." 2-ER-244, § 5(a)(i). And the Memorandum makes clear that agencies should only undertake actions that are consistent with their statutory authority. 2-ER-247. Thus, agencies are responsible for developing and implementing RIFs.

Plaintiffs' allegations do not establish otherwise. Plaintiffs do not claim, for example, that OPM is issuing RIF notices or directing the hiring and firing of any employees at any agency. Instead, they point to the President's decision to set broad policy priorities, which he obviously can do, and to interagency consultation. *E.g.*, 2-ER-159-66. Those actions violate no statute. And, even assuming that the President had authorized OPM to block RIFs by withholding "approval," that delegation still would not allow OPM to affirmatively *force* agencies to conduct RIFs, as plaintiffs erroneously allege, 2-ER-228-29. Indeed, OPM has long exercised unchallenged authority to "examine an agency's preparations for [a RIF] at any stage" and to "require appropriate corrective action" if it finds a violation of the RIF regulations that OPM itself promulgates. 5 C.F.R. § 351.205. And OPM routinely helps agencies in "oversee[ing], administer[ing], and guid[ing]" agency staff in conducting a RIF in line with complex regulatory requirements. *See* OPM, Agency Services, *Reductions in Force*, https://perma.cc/TQA4-HW64.

**2.** Finally, notice-and-comment rulemaking was not required to issue the Memorandum. It is not final agency action. *See supra* pp. 22-24. Rather, it is interagency guidance, which does not determine any legal rights or have the force and

effect of law. Because it is not a legislative rule, notice-and-comment requirements do not apply. *See Gill v. DOJ*, 913 F.3d 1179, 1186 (9th Cir. 2019).

## II. The balance of the equities favor the government.

**1.** The injunction causes irreparable harm. The President has determined that agencies should operate more efficiently and has directed agencies to undertake steps to optimize their workforces. The court's order prevents agencies from taking steps to implement this policy priority and determine how best to organize themselves, even though the government has "traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson v. Murray*, 415 U.S. 61, 83 (1974). Multiple RIFs were set to be noticed within the month following entry of the injunction, and dozens were set to occur during that period, 1-ER-9. The injunction halts those processes in their tracks with implications across the Executive Branch.

Moreover, the district court's injunction requires agencies to retain employees they would otherwise have let go in a RIF. The government will never be able to recover the cost of those salaries and benefits, even if the court's order is vacated. *See Maryland*, 2025 WL 1073657, at *1. The "nominal bond of $10 in total (not per plaintiff)" the district court imposed, 1-ER-51, is plainly inadequate to address that harm. The injunction costs the government millions of dollars each week; the bond will not cover even one hour's wages for the lowest-paid federal employee. Finally, the district court's exercise of jurisdiction, despite the existence of comprehensive remedial scheme, has a "disruptive effect on the administrative processes established

by the government to handle cases such as these." *Garcia v. United States*, 680 F.2d 29, 32 (5th Cir. 1982).

On the other side of the ledger, plaintiffs have not established irreparable injury warranting extraordinary relief. The district court primarily found irreparable harm based on harms to employees who may be separated. But in the ordinary course, employment disputes brought by proper plaintiffs—employees—rarely justify preliminary relief because there are procedures by which a terminated employee may obtain back pay. *See, e.g.*, *Sampson*, 415 U.S. at 92 & n.68. And, even assuming that any plaintiff established irreparable injury, such an injury would be outweighed by the public interest and the Executive Branch's interest in the effective and efficient management of the federal workforce.

**2.** Any injunctive relief "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Under settled principles of equity, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks omitted). Here, however, the district court made no effort to tailor relief to those of plaintiffs' members who can show they are likely to suffer an Article III injury absent equitable relief. At a minimum, its order should be so limited. For it is plaintiffs' burden to justify the scope of the injunctive relief sought and identify those parties that actually face imminent harm absent such relief. *See Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring).

36

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*maxwell.baldi@usdoj.gov*

June 2025

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

/s/ *Maxwell A. Baldi*
MAXWELL A. BALDI

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32-1(a) because it contains 8,873 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 301 ................................................................................................ A1

5 U.S.C. § 3101 .............................................................................................. A2

5 U.S.C. § 3502 .............................................................................................. A3

5 C.F.R. § 351.205 ......................................................................................... A6

**5 U.S.C. § 301**

**§ 301. Departmental regulations**

The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

**5 U.S.C. § 3101**

**§ 3101. General authority to employ**

Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year.

**5 U.S.C. § 3502**

**§ 3502. Order of retention**

(a) The Office of Personnel Management shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to-

    (1) tenure of employment;

    (2) military preference, subject to section 3501(a)(3) of this title;

    (3) length of service; and

    (4) efficiency or performance ratings.

In computing length of service, a competing employee-

    (A) who is not a retired member of a uniformed service is entitled to credit for the total length of time in active service in the armed forces;

    (B) who is a retired member of a uniformed service is entitled to credit for-

        (i) the length of time in active service in the armed forces during a war, or in a campaign or expedition for which a campaign badge has been authorized; or

        (ii) the total length of time in active service in the armed forces if he is included under section 3501(a)(3)(A), (B), or (C) of this title; and

    (C) is entitled to credit for-

        (i) service rendered as an employee of a county committee established pursuant to section 8(b) of the Soil Conservation and Allotment Act or of a committee or association of producers described in section 10(b) of the Agricultural Adjustment Act; and

        (ii) service rendered as an employee described in section 2105(c) if such employee moves or has moved, on or after January 1, 1987, without a break in service of more than 3 days, from a position in a nonappropriated fund instrumentality of the Department of Defense or the Coast Guard to a position in the Department of Defense or the Coast Guard, respectively, that is not described in section 2105(c).

(b) A preference eligible described in section 2108(3)(C) of this title who has a compensable service-connected disability of 30 percent or more and whose performance has not been rated unacceptable under a performance appraisal system implemented under chapter 43 of this title is entitled to be retained in preference to other preference eligibles.

(c) An employee who is entitled to retention preference and whose performance has not been rated unacceptable under a performance appraisal system implemented under chapter 43 of this title is entitled to be retained in preference to other competing employees.

(d)

    (1) Except as provided under subsection (e), an employee may not be released, due to a reduction in force, unless-

(A) such employee and such employee's exclusive representative for collective-bargaining purposes (if any) are given written notice, in conformance with the requirements of paragraph (2), at least 60 days before such employee is so released; and

(B) if the reduction in force would involve the separation of a significant number of employees, the requirements of paragraph (3) are met at least 60 days before any employee is so released.

(2) Any notice under paragraph (1)(A) shall include-

(A) the personnel action to be taken with respect to the employee involved;

(B) the effective date of the action;

(C) a description of the procedures applicable in identifying employees for release;

(D) the employee's ranking relative to other competing employees, and how that ranking was determined; and

(E) a description of any appeal or other rights which may be available.

(3) Notice under paragraph (1)(B)-

(A) shall be given to-

(i) the appropriate State dislocated worker unit or units (referred to in section 311(b)(2) of the Job Training Partnership Act); and

(ii) the chief elected official of such unit or each of such units of local government as may be appropriate; and

(B) shall consist of written notification as to-

(i) the number of employees to be separated from service due to the reduction in force (broken down by geographic area or on such other basis as may be required under paragraph (4));

(ii) when those separations will occur; and

(iii) any other matter which might facilitate the delivery of rapid response assistance or other services under the Job Training Partnership Act.

(4) The Office shall prescribe such regulations as may be necessary to carry out this subsection. The Office shall consult with the Secretary of Labor on matters relating to the Job Training Partnership Act.

(e)

(1) Subject to paragraph (3), upon request submitted under paragraph (2), the President may, in writing, shorten the period of advance notice required under subsection (d)(1)(A) and (B), with respect to a particular reduction in force, if necessary because of circumstances not reasonably foreseeable.

(2) A request to shorten notice periods shall be submitted to the President by the head of the agency involved, and shall indicate the reduction in force to which the request pertains, the number of days by which the agency head

A4

requests that the periods be shortened, and the reasons why the request is necessary.

(3) No notice period may be shortened to less than 30 days under this subsection.

**5 C.F.R. § 351.205**

**§ 351.205. Authority of OPM.**

The Office of Personnel Management may establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force. OPM may examine an agency's preparations for reduction in force at any stage. When OPM finds that an agency's preparations are contrary to the express provisions or to the spirit and intent of these regulations or that they would result in violation of employee rights or equities, OPM may require appropriate corrective action.