# SUPREME COURT OF THE UNITED STATES

————

No. 24A1174

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, ET AL.

ON APPLICATION FOR STAY

[July 8, 2025]

The application for stay presented to Justice Kagan and by her referred to the Court is granted. The May 22, 2025 preliminary injunction entered by the United States District Court for the Northern District of California, case No. 3:25–cv–3698, is stayed pending the disposition of the appeal in the United States Court of Appeals for the Ninth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

The District Court's injunction was based on its view that Executive Order No. 14210, 90 Fed. Reg. 9669 (2025), and a joint memorandum from the Office of Management and Budget and Office of Personnel Management implementing that Executive Order are unlawful. Because the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful—and because the other factors bearing on whether to grant a stay are satisfied—we grant the application. We express no view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order and Memorandum. The District Court enjoined further implementation or approval of the plans based on its view about the illegality of the Executive Order and Memorandum, not on any

2          TRUMP *v.* AMERICAN FEDERATION
                OF GOVERNMENT EMPLOYEES
                    SOTOMAYOR, J., concurring

assessment of the plans themselves. Those plans are not before this Court.

JUSTICE SOTOMAYOR, concurring in the grant of stay.

I agree with JUSTICE JACKSON that the President cannot restructure federal agencies in a manner inconsistent with congressional mandates. See *post,* at 13. Here, however, the relevant Executive Order directs agencies to plan reorganizations and reductions in force "consistent with applicable law," App. to Application for Stay 2a, and the resulting joint memorandum from the Office of Management and Budget and Office of Personnel Management reiterates as much. The plans themselves are not before this Court, at this stage, and we thus have no occasion to consider whether they can and will be carried out consistent with the constraints of law. I join the Court's stay because it leaves the District Court free to consider those questions in the first instance.

Cite as: 606 U. S. ____ (2025)          1

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 24A1174

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, ET AL.

ON APPLICATION FOR STAY

[July 8, 2025]

JUSTICE JACKSON, dissenting from the grant of application for stay.

Under our Constitution, Congress has the power to establish administrative agencies and detail their functions. Thus, over the past century, Presidents who have attempted to reorganize the Federal Government have first obtained authorization from Congress to do so. The President sharply departed from that settled practice on February 11, 2025, however, by allegedly arrogating this power to himself. With no mention of congressional buy-in, the President's Executive Order No. 14210 mandates a "critical transformation" of the Federal Government, to be accomplished by "eliminat[ing] or consolidat[ing]" existing agencies and ordering agency heads to "promptly undertake preparations to initiate large-scale reductions in force." 90 Fed. Reg. 9669, 9670.

This unilateral decision to "transform[m]" the Federal Government was quickly challenged in federal court. As relevant here, the District Judge thoroughly examined the evidence, considered applicable law, and made a reasoned determination that Executive Branch officials should be enjoined from implementing the mandated restructuring until this legal challenge to the President's authority to undertake such action could be litigated. But that temporary, practical, harm-reducing preservation of the status quo was

2          TRUMP *v.* AMERICAN FEDERATION
              OF GOVERNMENT EMPLOYEES
                    JACKSON, J., dissenting

no match for this Court's demonstrated enthusiasm for greenlighting this President's legally dubious actions in an emergency posture.

The Court has now stayed the District Court's preliminary injunction—authorizing implementation of Executive Order No. 14210, and all the harmful upheaval that edict entails, while the lower courts evaluate its lawfulness. In my view, this was the wrong decision at the wrong moment, especially given what little this Court knows about what is actually happening on the ground.

To be specific: What is at issue here is whether Executive Order No. 14210 effects a massive restructuring of the Federal Government (the likes of which have historically required Congress's approval), on the one hand, or minor workforce reductions consistent with existing law, on the other. One needs *facts* to answer that critical question, and the District Court not only issued such preliminary findings based on actual evidence, it is also the tribunal best positioned to make that determination, at least initially. Put differently, from its lofty perch far from the facts or the evidence, this Court lacks the capacity to fully evaluate, much less responsibly override, reasoned lower court factfinding about what this challenged executive action actually entails. I respectfully dissent because, in addition to the Government's failure to show the exigency or irreparable harm that is required for emergency relief, this Court could not possibly *know* in this posture whether the Government is likely to succeed on the merits with respect to such a fact-dependent dispute. So it should have left well enough alone.

                              I

This is not the first time that a President has wanted to restructure the Federal Government. Even the most cursory examination of history readily reveals that, over the

Cite as: 606 U. S. ____ (2025)          3

JACKSON, J., dissenting

past century, Presidents have worked *with* Congress—rather than around it—when seeking to significantly reorganize the agencies that comprise the Executive Branch.

Aside from prior wartime-specific grants of reorganization authority, Congress first gave general reorganization authority to President Hoover in the 1930s. S. Rep. No. 115–381, p. 4 (2018) (detailing history of interactions between Congress and the President concerning reorganizations). At that time, Congress delegated specific authority to the President to transfer agencies between departments, consolidate agencies, and change the functions of agencies. *Ibid.*, and n. 18 (citing Legislative Appropriations Act for Fiscal Year 1933, §§401, 403, 47 Stat. 413).

Since then, Congress has considered similar requests for reorganization authority, and it has granted such authority (for limited time periods) to eight more Presidents, including Presidents Franklin D. Roosevelt, Eisenhower, Kennedy, Nixon, Carter, and Reagan. S. Rep. No. 115–381, at 4. Far from fully ceding to Presidents unfettered discretion to reorganize the Executive Branch, Congress has, in fact, "amended, extended, narrowed, or reactivated [its] government reorganization authority 16 times under both Republican and Democratic administrations." *Ibid*.

The many reorganization acts that Congress has passed since 1932 vary in the degree of discretion conferred. But all have given Congress a say before the President has implemented any proposed plans to reorganize agencies' structures. *Ibid*. Pursuant to that process, as of the last time Congress expressly granted this reorganization authority, "presidents [had] submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." *Id.*, at 5.

To understand the nature of these reorganization acts, consider the last one Congress enacted. The Reorganization Act of 1984 allowed President Reagan to make signifi-

4          TRUMP *v.* AMERICAN FEDERATION
              OF GOVERNMENT EMPLOYEES
                    JACKSON, J., dissenting

cant changes to the structure of agencies based upon a finding that such changes were necessary to carry out specified policies. 5 U. S. C. §901(a). Congress defined "reorganization" to include (1) "the transfer of the whole or a part of an agency," (2) "the abolition of all or a part of the functions of an agency," (3) "the consolidation or coordination of the whole or a part of an agency, or of the whole or a part of the functions thereof, with the whole or a part of another agency or the functions thereof," (4) "the consolidation or coordination of part of an agency or the functions thereof with another part of the same agency or the functions thereof," (5) "the authorization of an officer to delegate any of his functions," and (6) "the abolition of the whole or a part of an agency." §903(a). Under the 1984 law, President Reagan was required to submit his reorganization plans to Congress, which could request further information about those plans. §903(b). This latest reorganization act expired in 1984, and Congress has not renewed it since. §905(b).

Congress has not only granted presidential requests for reorganization authority; it has also rejected such requests at times. For instance, in 2012, President Obama asked Congress to reauthorize a modified version of the 1984 Reorganization Act for two years. S. Rep. No. 115–381, at 6. President Obama indicated that he planned to consolidate several business and trade agencies. *Ibid*. But Congress never passed the proposed legislation. *Ibid*. President George W. Bush and President Trump (in his first term) also unsuccessfully sought reorganization authority from Congress. H. Hogue, Congressional Research Service Report to Congress, Presidential Reorganization Authority 32–33 (2012); H. R. 6787, 115th Cong., 2d Sess. (2018); S. 3137, 115th Cong., 2d Sess. (2018).

To be sure, historical precedent exists for a President to direct smaller-scale workforce reductions without first obtaining congressional authorization. In 1993, for example, President Clinton issued an executive order to reduce the

Cite as: 606 U. S. ____ (2025)          5

JACKSON, J., dissenting

size of the federal workforce by requiring agencies to eliminate four percent of their full-time positions over three years. Exec. Order No. 12839, 58 Fed. Reg. 8515 (1993). That order did not mandate reductions in force or reorganizations, however. Instead, the workforce reduction was to be achieved "through attrition or early out programs established at the discretion of the department and agency heads." *Ibid.* And President Clinton also later obtained congressional authorization for his plans. See Federal Workforce Restructuring Act of 1994, 108 Stat. 111.

Historical practice thus confirms that, while Presidents possess some discretion to reduce federal employment, they may not fundamentally restructure the Federal Government all on their own. Administrative agencies are created by statute and funded by Congress; therefore, Presidents have traditionally worked with Congress to effect significant alterations of those statutory structures. This history is crucial to understand, because it establishes the "status quo" when it comes to the relative roles of Congress and the President in reorganizing the Federal Government.

II

Given this background, one might have expected this President, like his predecessors, to obtain congressional authorization before launching the dramatic structural overhaul that Executive Order No. 14210 directs. That order mandates that nearly all federal agencies "promptly undertake preparations to initiate large-scale reductions in force (RIFs)" and agency reorganizations. 90 Fed. Reg. 9670. And, as I previously noted, the order does not mandate pre-implementation authorization by Congress. Instead, it requires agencies to submit "RIF and Reorganization Plans" to the Office of Management and Budget (OMB). *Ibid.*

The Directors of OMB and the Office of Personnel Management (OPM) have issued a Memorandum (Feb. 26, 2025)

6      TRUMP *v.* AMERICAN FEDERATION
OF GOVERNMENT EMPLOYEES
JACKSON, J., dissenting

pursuant to Executive Order No. 14210 instructing department and agency heads to submit reorganization plans for review by OMB, OPM, and the Department of Government Efficiency. As justification for this directive, the Memorandum points to the President's promise "to sweepingly reform the federal government." App. to Application for Stay 4a (App.). The Memorandum also directs agency heads to prioritize reducing full-time employment positions, so as to achieve "maximum elimination of functions that are not statutorily mandated," and to cut "components and positions that are non-critical." *Id.*, at 5a. And while the Memorandum does require agencies to consider planning for some degree of eventual congressional engagement, the executive action itself does not rest on any grant of reorganization authority by Congress. Nor could it, as Congress has not granted such authority to the President.[1]

Unions, nonprofits, and local governments filed this lawsuit challenging what they allege to be a dramatic plan to dismantle the Federal Government without congressional authorization. At the preliminary-relief stage, the District Court's task was to focus on how "to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities as the litigation moves forward." *Lackey* v. *Stinnie*, 604 U. S. ___, ___ (2025) (slip op.,

───────────

[1] As I understand the present situation, a specific proposal to extend reorganization authority to this President exists, see Reorganizing Government Act of 2025, H. R. 1295, 119th Cong., 1st Sess. (2025), but it has yet to be enacted. Some members of Congress also proposed extending reorganization authority to the President through the recently passed domestic policy bill, but the final legislation did not do so. Compare Senate Committee on Homeland Security and Governmental Affairs, Draft Reconciliation Bill Text §90107 (June 12, 2025), https://www.paul.senate.gov/wp-content/uploads/2025/06/MDM25B50.pdf (proposing extension of explicit reorganization authority), with H. R. 1, 119th Cong., 1st Sess. §90103 (2025) (appropriating funds for "finding budget and accounting efficiencies in the executive branch" but making no reference to reorganization authority).

Cite as: 606 U. S. ____ (2025)          7

JACKSON, J., dissenting

at 6) (internal quotation marks and citation omitted). Moreover, and notably, the central question the District Court faced was primarily one of fact: Was the President actually engaging in mere reductions in force consistent with existing law, as the Government asserted? Or were the plaintiffs right that the President was really attempting to fundamentally reorganize the structure of the Government? If the latter, historical precedent confirms that preserving the status quo would mean temporarily preventing the President from unilaterally doing what his predecessors only did after receiving specific authorization from Congress.

The District Court received extensive evidence from the plaintiffs and scant submissions from the Government, and it carefully reviewed everything before it, as I describe in Part III–A, *infra.* In a detailed 55-page opinion that focuses on the standard factors for preliminary injunctive relief, the court then explained its fact-based conclusion: "[T]he role of a district court is to examine the evidence, and at this stage of the case the evidence discredits the executive's position and persuades the Court that plaintiffs are likely to succeed on the merits of their suit." App. 12a.

Notably, based on the evidence presented, the District Court specifically found that several federal agencies were in the process of rapidly implementing reorganizations and large-scale reductions in force. *Ibid.* It also found that proposed changes appeared to "intentionally or negligently flout the tasks Congress has assigned" to the agencies at issue. *Ibid.* And the District Court further determined that if it did not pause this restructuring in the interim (while the litigation is ongoing), then many "agencies will not be able to do what Congress has directed them to do." *Ibid.*

To forestall this significant harm, the court enjoined the President's restructuring mandate for the duration of the lawsuit "[t]o preserve the status quo and protect the power of the legislative branch." *Id.,* at 14a. The Ninth Circuit

8            TRUMP *v.* AMERICAN FEDERATION
             OF GOVERNMENT EMPLOYEES
                  JACKSON, J., dissenting

then declined to upset that temporary injunction during the appeal. *Id.*, at 69a.

## III

Instead of directing its attention and resources to fully litigating the merits of the challenge to its authority in the courts below, the Government rushed up the chain of review, seeking an emergency stay of the District Court's preliminary injunction from us. We thus faced the question whether to override the judgments of the two courts below by allowing the President to proceed *immediately* with implementing his restructuring plans. To answer "no" to that question is simply to preserve the status quo while the lower courts expeditiously decide the lawfulness of the President's order. To answer "yes"—as the Court now does—is to allow an apparently unprecedented and congressionally unsanctioned dismantling of the Federal Government to continue apace, causing irreparable harm before courts can determine whether the President has the authority to engage in the actions he proposes.

### A

As I see the choice before us, the Court's merits-focused approach to granting this stay is particularly problematic because the District Court's decision to issue an injunction was based on *findings of fact*. It is not this Court's role to swoop in and second-guess a lower court's factual findings, especially when that court has made well reasoned, preliminary judgments on a developing record. But that is precisely what the majority does in granting this stay.

As I previewed above, the District Court extensively examined the evidence the parties presented, which included 68 sworn declarations from plaintiffs (totaling more than 1,400 pages) and a single declaration from the Government. *Id.*, at 13a, 88a. The court also completed an *in camera* review of several proposed agency reorganization plans (plans

Cite as: 606 U. S. ____ (2025)          9

JACKSON, J., dissenting

that the Government did not submit in its application to this Court). Based on its review of all of this evidence, the District Court found that the plaintiffs were likely to succeed in showing that the challenged Executive Order and Memorandum seek to effect a fundamental transformation of the Federal Government, rather than mere reductions in force consistent with existing statutory authority. Still, despite this factbound determination and the extensive fact-finding that supports it, the Court now cavalierly concludes (in just one line) that "the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful." *Ante*, at 1.

To be clear: Today's merits dispute is *not* about the President's ability to unilaterally restructure the Federal Government—no one argues that it is lawful for him to do so. Instead, the President insists that his Administration's actions in carrying out the Executive Order and Memorandum are an exercise of existing executive-branch authority to make staffing decisions, not a fundamental reorganization of the Federal Government. Application for Stay 5–6. So, the merits question for purposes of interim relief is whether that is likely true.

The District Court considered that issue and found the consistent-with-law language in the Executive Order and Memorandum to be inconsistent with the factual record. App. 49a–51a; see also *supra*, at 7–8, and n. 2, *infra*. For instance, the court highlighted plans to terminate more than half of many agencies' staff and to "practically wipe out" entire agencies. App. 50a. And those plans were not outliers; rather, according to the District Court, they appear to reflect the whole point of this executive action.[2] The

─────────

[2]Due to the Government's refusal to disclose nearly all agency reorganization plans (except for four that the District Court reviewed *in camera*), App. 20a, 46a, the details remain murky in this preliminary posture. But the Government concedes that—as of May 16—about 40 reductions in force were already in progress across 17 agencies. *Id.*, at

10          TRUMP *v.* AMERICAN FEDERATION
                OF GOVERNMENT EMPLOYEES
                    JACKSON, J., dissenting

District Court's preliminary factfinding was vital to its conclusion that plaintiffs are likely to succeed in showing that the challenged executive action amounts to a wholesale government reorganization. Thus, the majority's rejection of that determination—*i.e.*, its passing reference to the lawfulness of the Executive Order and Memorandum—must rest on a conclusion that the District Court was *wrong* about the facts of what is really happening to agencies and their employees pursuant to this executive action.

That approach is plainly inconsistent with this Court's traditional role. District courts are far better suited than appellate courts (this one especially) to evaluate facts on the ground. See *Anderson* v. *Bessemer City*, 470 U. S. 564, 574–575 (1985) (explaining that trial judges' expertise in making factual determinations warrants deference on appeal). Accordingly, Federal Rule of Civil Procedure 52(a)(6) establishes that a trial court's factual findings "must not be set aside unless clearly erroneous." And this Court has, historically, acknowledged its own limitations, citing the "well-settled rule" that "factual findings are reviewable only for clear error," "with a serious thumb on the scale" supporting the district court's evaluation of evidence. *U. S. Bank N. A.* v. *Village at Lakeridge, LLC*, 583 U. S. 387, 394 (2018).

What is more, deference toward lower court factfinding should be at its peak at this extremely early stage of the

———————

18a. Moreover, the extensive (and unrebutted) record demonstrates that those planned personnel changes are massive. The District Court cited multiple examples to illustrate this point, including proposed reductions in force of approximately 93 percent of employees at the National Institute for Occupational Safety and Health, nearly half the workforce at the Department of Energy, and more than half the workforce of the National Oceanic and Atmospheric Association. *Id.*, at 18a, 50a. Also in evidence were proposed cuts of 70 percent of the staff at the Department of Labor's headquarters and 83,000 workers at the Department of Veterans Affairs, just to name a few. *Id.*, at 18a; see also *id.*, at 82a (Ninth Circuit recitation of agencies proposing to eliminate more than 85 percent of their workforces).

JACKSON, J., dissenting

litigation process—when what we are considering is an application for an emergency stay of a preliminary injunction. Even when deciding the actual appeal of a preliminary injunction (still down the road), "this Court may only consider whether issuance of the injunction constituted an abuse of discretion." *Brown* v. *Chote*, 411 U. S. 452, 457 (1973).

The clear-error review that governs factual findings, (see Fed. Rules Civ. Proc. 52(a)(2), (6)), and the deference owed to a district court's issuance of preliminary relief weigh heavily against intervening to override the reasoned, fact-based judgments of the lower courts. Add to that the requirement that an applicant for emergency relief make not just a showing, but a "'*strong*'" one, "'that he is likely to succeed on the merits,'" *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (emphasis added), and it is no wonder that this Court has long considered stays to be "extraordinary" relief. Cf. *Graves* v. *Barnes*, 405 U. S. 1201, 1203 (1972) (Powell, J., in chambers) (explaining that this Court grants stays pending appeal "only in extraordinary circumstances" because a "lower court judgment, entered by a tribunal that was closer to the facts . . . is entitled to a presumption of validity"). Together, these deferential standards should make it the truly rare occasion that this Court uses its emergency docket to overrule district courts' fact-based, preliminary determinations on the merits. That also makes perfect sense in light of quickly developing records and lower courts that are far better acquainted with those facts.

But, today, this Court once again ignores all of this while casually discarding 55 pages of evidence-based lower court reasoning. On what grounds does the majority deviate from the District Court's fact-based findings here? Has it found that the court below clearly erred with respect to its assessment of the evidence? Has it opted to simply ignore the well-settled deferential standards of review? Has it made its own factual findings about the nature, scope, and extent of the Government's reorganization activities? All of these

12          TRUMP *v.* AMERICAN FEDERATION
                OF GOVERNMENT EMPLOYEES
                    JACKSON, J., dissenting

possibilities are problematic. And because the Court provides no explanation for its likelihood-of-success conclusion, the answers to these crucial questions are also anyone's guess.[3]

### B

The Court's disregard for the District Court's factfinding (and also, apparently, for the applicable standards of review) would be troubling enough when viewed through a mere procedural lens. But it is all the more puzzling, and ultimately disheartening, given the extraordinary risk of harm that today's ruling immediately unleashes.

No one seriously disputes that, if implemented, Executive Order No. 14210 will lead to enormous real-world consequences. This executive action promises mass employee terminations, widespread cancellation of federal programs and services, and the dismantling of much of the Federal Government as Congress has created it. As the Ninth Circuit concluded, the statutory shortfalls likely to result from implementation of this Executive Order will be immensely painful to the general public, and the plaintiffs, in the interim, causing harm that includes "proliferat[ing] food-borne disease," perpetuating "hazardous environmental conditions," "eviscerat[ing] disaster loan services for local businesses," and "drastically reduc[ing] the provision of

---

[3] The Court does observe that the specific reorganization plans are not yet before it. *Ante,* at 1–2. But that suggests that the Court is in a position to assess the lawfulness of this executive action (for now) by ignoring what the Government is actually doing. The District Court's careful, sensible, and detailed consideration of what is happening in the real world belies that assumption; indeed, it ably demonstrates that the likelihood of success on the merits of the legal claims at issue here can only be determined relative to facts, no matter how much the majority maneuvers to get around them. If every (or nearly every) reorganization plan seeks to gut federal agencies—as the evidence indicates so far—then the whole executive action is unlawful, not just each individual plan.

Cite as: 606 U. S. \_\_\_\_ (2025)          13

JACKSON, J., dissenting

healthcare and other services to our nation's veterans."
App. 94a. Preventing those kinds of calamities is just a
small slice of the work that federal employees do to carry
out Congress's statutory mandates—work that the Execu-
tive Order immediately imperils if implemented.

Consider the harms to democracy, too, if it turns out that
the plaintiffs and the lower courts are right that the Presi-
dent is unilaterally changing the structure of the Federal
Government. What one person (or President) might call bu-
reaucratic bloat is a farmer's prospect for a healthy crop, a
coal miner's chance to breathe free from black lung, or a
preschooler's opportunity to learn in a safe environment.
The details of the programs that this executive action tar-
gets are the product of policy choices that Congress has
made—a representative democracy at work. While the
President no doubt has the authority to manage the Execu-
tive Branch, our system does not allow the President to re-
write laws on his own under the guise of that authority.

"The President's power, if any, to issue [an executive] or-
der must stem either from an act of Congress or from the
Constitution itself." *Youngstown Sheet & Tube Co.* v. *Saw-
yer*, 343 U. S. 579, 585 (1952). This constraint on the Pres-
ident is protective of democracy, not an impediment to it.
That is, although the President is an elected representative
with a claim on the popular will, so too are the People's rep-
resentatives in Congress—and our Constitution gives *them*
the power to make laws. If a President runs roughshod over
the carefully crafted statutes that authorize and animate
the Federal Government (as the District Court's prelimi-
nary findings show to be likely happening here), he discards
and disables the democratic system that created those laws.

It is the duty of judges to safeguard that system. Partic-
ularly when a President "takes measures incompatible with
the expressed or implied will of Congress," his claim to
power "must be scrutinized with caution, for what is at
stake is the equilibrium established by our constitutional

14            TRUMP *v.* AMERICAN FEDERATION
              OF GOVERNMENT EMPLOYEES
              JACKSON, J., dissenting

system." *Id.*, at 637–638 (R. Jackson, J., concurring).  But,
today, the Court exercises neither caution nor scrutiny, es-
pecially compared to the reasoned decisions issued by the
courts below.  With scant justification, the majority permits
the immediate and potentially devastating aggrandizement
of one branch (the Executive) at the expense of another
(Congress), and once again leaves the People paying the
price for its reckless emergency-docket determinations.

                    *       *       *

Given the fact-based nature of the issue in this case and
the many serious harms that result from allowing the Pres-
ident to dramatically reconfigure the Federal Government,
it was eminently reasonable for the District Court to main-
tain the status quo while the courts evaluate the lawfulness
of the President's executive action.  At bottom, this case is
about whether that action amounts to a structural overhaul
that usurps Congress's policymaking prerogatives—and it
is hard to imagine deciding that question in any meaningful
way *after* those changes have happened.  Yet, for some rea-
son, this Court sees fit to step in now and release the Pres-
ident's wrecking ball at the outset of this litigation.

In my view, this decision is not only truly unfortunate but
also hubristic and senseless.  Lower court judges have their
fingers on the pulse of what is happening on the ground and
are indisputably best positioned to determine the relevant
facts—including those that underlie fair assessments of the
merits, harms, and equities.  I see no basis to conclude that
the District Court erred—let alone clearly so—in finding
that the President is attempting to fundamentally restruc-
ture the Federal Government.  Therefore, I would not dis-
rupt the lower courts' preservation of the status quo.  In-
stead, I would leave intact their protection of the historical
relationship between Congress and the President, prevent-
ing irreparable harm to the plaintiffs and the public while

Cite as: 606 U. S. ____ (2025)          15

JACKSON, J., dissenting

the Judiciary does the critical work of evaluating this exercise of power.